**08 C 89**

**JUDGE ANDERSEN**
**MAGISTRATE JUDGE BROWN**

# EXHIBIT A

# MEMORANDUM OF AGREEMENT

THIS AGREEMENT made and entered into by and between MACDONALD CONSTRUCTION SERVICES, INC.

308 OAKLEAF ROAD LAKE IN THE HILLS, IL 60156 , its successors and assigns, hereinafter referred to as the "EMPLOYER", First Party, and LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, hereinafter referred to as the "UNION", Second Party.

THIS AGREEMENT is made in consideration of the instant promises of the First and Second Parties and the parties do hereby agree as follows:

1. The EMPLOYER recognizes the UNION as the sole and exclusive bargaining representative for and on behalf of the employees of the EMPLOYER within the territorial and occupational jurisdiction of the UNION. Prior to recognition, the EMPLOYER was presented and reviewed valid written evidence of the UNION's exclusive designation as bargaining representative by the majority of appropriate bargaining unit employees of EMPLOYER.

2. The Parties agree that the EMPLOYER is part of a single bargaining unit made up of all employers party to the Master Agreement adopted herein.

3. The Parties do hereby adopt the Master Agreement dated JUNE 1, 2001

entered into by and between the UNION and the MID – AMERICA BARGAINING

ASSOCIATION ILLINOIS BUILDING AGREEMENT and the parties do hereby mutually agree to be bound by the terms and conditions of that Master Agreement and the Agreement and Declaration of Trust of the Midwest Operating Engineers Pension Plan, Midwest Operating Engineers Welfare Plan, Local 150 I.U.O.E. Vacation Savings Plan and the Local 150 Apprenticeship Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein. The Employer acknowledges that he has received a copy of the aforesaid Master Agreement, that he has reviewed same and that he is aware of the obligations arising thereunder.

4. This Agreement and the adoption of the Master Agreement and the Agreements and Declarations of

Trust referred to in paragraph 3 above, shall be effective as of JULY 10, 2006

, and remain in effect to and including the expiration date of the Master Agreement adopted herein. This Agreement shall continue in effect from year to year thereafter and specifically adopt any Master Agreement entered into between the Union and N.A.R.E.A. – ILLINOIS

BUILDING AGREEMENT subsequent to the expiration date of the Master Agreement herein adopted unless notice of termination or amendment is given in the manner provided herein.

5. Either Party desiring to amend or terminate this Memorandum of Agreement must notify the other in writing at least three (3) calendar months prior to the expiration of the Master Agreement adopted herein.

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Agreement the

10TH day of JULY 2006

MACDONALD CONSTRUCTION SERVICES, INC.
                Employer

LOCAL 150, INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO

By EDWARD J. MACDONALD

By WILLIAM E. DUGAN

STEVEN M. CISCO

PRINT          Title PRESIDENT
O/847-458-8736
F/847-854-2928

TOM GRUBER
Below this line for office use only

Form 150

| | |
|---|---|
| **NO:** Fringe Benefits - Unincorporated Owner/Operator | |
| X **YES:** Fringe Benefits - Bargaining Unit Employees | |

Certified Under 168 Hour Contribution Clause

**EXHIBIT B**

## MEETING SCHEDULE

**CHICAGO**

**MARION** 2nd Thursday

**ROCKFORD** 2nd Thursday

**UTICA** 3rd Thursday

**LASALLE** 3rd Thursday

**MERRILLVILLE** 2nd Thursday

**ROCK ISLAND** 2nd Thursday

No District Meeting

In Months of June and August

General Membership Meetings
January and July

Check 150 Engineer for Changes

---

# ILLINOIS BUILDING

# AGREEMENT
DISTRICTS 1, 2, 3

INTERNATIONAL UNION OF OPERATING ENGINEERS
LOCAL 150
AFL-CIO

EFFECTIVE JUNE 1, 2001
THROUGH MAY 31, 2007

# BUILDING AGREEMENT
## DISTRICTS 1-2-3

Mid America Regional Bargaining Association and the Contractors of Will and Grundy Counties have negotiated separate Building Agreements for Districts 1-2-3 with Local 150.

The agreements are identical except that the Association of Will and Grundy Counties represent their individual membership only.

**APPRENTICESHIP OFFICE**
Westport Road, Channahon, Illinois 60544
Telephone (815) 436-5150

**HEALTH WELFARE PENSION AND VACATION SAVINGS**
6150 Joliet Road, Countryside, Illinois 60525
Telephone (708) 482-7300
Toll Free Number - Credit
Members In Ind. Mich. Wisc. & Iowa
(800) 323-8521
Members In Illinois  (800) 232-6887

**MID-WEST OPERATING ENGINEERS CREDIT UNION**
6150 Joliet Road, Countryside, Illinois 60525
Telephone (708) 482-9606

# MARBA ILLINOIS BUILDING AGREEMENT

## Table of Contents

Joint Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Article I**

Section 1  Bargaining Unit . . . . . . . . . . . . . . . . . . . . . 2
Section 2  Recognition . . . . . . . . . . . . . . . . . . . . . . . 3
Section 3  Scope of Work . . . . . . . . . . . . . . . . . . . . . 4
Section 4  Union Shop . . . . . . . . . . . . . . . . . . . . . . . 4
Management Rights . . . . . . . . . . . . . . . . . . . . . . . . . 5
Section 5  Job Conference . . . . . . . . . . . . . . . . . . . . . 5
Section 6  Branches of Work . . . . . . . . . . . . . . . . . . . 5
Section 7  Successor / Employers . . . . . . . . . . . . . . . . 6
Notice to the Union . . . . . . . . . . . . . . . . . . . . . . . . 6
Section 8  Assignment of Work . . . . . . . . . . . . . . . . . 7

**Article II**

Section 1  Grievances and Arbitration . . . . . . . . . . . . . 7
Step One . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Step Two . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Step Three . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
Section 2  Bonding of Employer . . . . . . . . . . . . . . . . . 10
Section 3  Penalty for Failure to Pay Wages or
Fringe Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Wages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Penalty for Failure to Pay Pension and/or Health
and Welfare and/or Vacation Contributions
and/or Dues Check Off . . . . . . . . . . . . . . . . . . . . . 11
Section 4  Legitimate Picket Line . . . . . . . . . . . . . . . . 11
Section 5  Access to Premises . . . . . . . . . . . . . . . . . . 12
Section 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
No Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . 12
Insurance Coverage . . . . . . . . . . . . . . . . . . . . . . . . 12

Insurance, Sanitation ........................ 12
Occupational Injury ......................... 12
Section 7 Hiring ............................ 12
Section 8 Subcontractor ..................... 13

**Article III**
Section 1 Job Steward ....................... 13
Section 2 Regular Assigned Engineers ........ 13
Section 3 Shelter and Safety ................ 14
Section 4 Radiation Detection ............... 14
Section 5 Transportation .................... 14
Section 6 Notice on Leaving Job ............. 15
Section 7 Discharge ......................... 15

**Article IV**
Civil Foreman .............................. 15

**Article V**
Section 1 Starting Time - Work Day - Lunch Period ... 17
Section 2 Starting Time ..................... 17
Section 3 Work Day .......................... 17
Section 4 Lunch Period ...................... 18
Section 2 Show-Up Time ...................... 18
Section 3 Shift Work ........................ 20
Section 4 Number of Men - Continuous Three
(3) Shift Operation ......................... 22
Section 5 Overtime - Holidays ............... 22
Section 6 Severance Pay ..................... 23
Section 7 Wage Payment ...................... 23
Section 8 Changing From One Machine to Another ... 23
Section 9 Idle Time - Class I and Class II Equipment ... 24
Class III Equipment and Class IV Oilers ..... 24
Section 10 Maintenance and Heavy Duty Repair ... 25
Section 11 Loading .......................... 26
Moving ..................................... 26

Section 11 Mechanics ........................ 26
Section 12 Duties of the Oiler .............. 28

**Article VI**
Section 1 Preparing Equipment ............... 28
Section 2 Machinery Operation ............... 29
Section 3 Machine Reference Guide ........... 31
Section 4 Long Boom Pay ..................... 31
Section 5 Capacity Pay ...................... 32
Section 6 Augers and Drill Rigs ............. 32
Section 7 Creter Cranes ..................... 32
Section 8 Truck Mounted Concrete Pumps ...... 32
Section 9 Truck Mounted Concrete Conveyors .. 32
Section 10 Helicopters ...................... 33
Section 11 Brick Forklifts .................. 33
Section 12 Bobcats .......................... 33
Section 13 Tieback Machines ................. 34
Section 14 Elevators ........................ 34
Section 15 Bobcats, Skidsteer Loaders, Forklifts ... 34
Servicing Brick Masons and Drills ........... 35
Section 16 Small Equipment .................. 36
Section 17 Small Category Equipment Assignment ... 37
Section 18 Electric Submersible Pumps -
Job Sites or Projects ....................... 38
Combination A & C ........................... 40
Combination D & B ........................... 40
Section 19 Electric Submersible Pumps - Tunnels, etc. ... 40

**Article VII**
Section 1 Boiler Plants ..................... 41
Section 2 Washing Boilers ................... 42
Section 3 Concrete Mixer .................... 42
Section 4 Hoists ............................ 42
Section 5 Generators ........................ 42

**Article VIII**

Section 1 Wage Rates and Fringe Benefits. . . . . . . . . . . . . . . 43
  Class I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
  Class II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
  Class III . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
  Class IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
Section 2 Fringe Benefits First and Second Year Apprentices . . 52
  Fringe Benefits Third and Fourth Year Apprentices . . . . . 53
  Wages for Apprentices . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
Section 2.1 Specialized Training . . . . . . . . . . . . . . . . . . . . . . . 54
  Establishment of Joint Management Committee
  For Certification, Training / Testing Data Base . . . . . . . . . 54
Section 3 New and Unlisted Equipment . . . . . . . . . . . . . . . . . . 55
Section 4 Jurisdictional Disputes . . . . . . . . . . . . . . . . . . . . . . . 55
  All Counties (excluding Cook) . . . . . . . . . . . . . . . . . . . . . 55
  Cook County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

**Article IX**

Section 1 Welfare Fund. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
  Family and Medical Leave Act (FMLA) . . . . . . . . . . . . . . 59
Section 2 Pension Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
Section 3 Vacation Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Article X**

  Apprenticeship and Skill Improvement Fund . . . . . . . . . . . 66

**Article XI**

  Dues Check Off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**Article XII**

  Construction Industry Research and
  Service Trust Fund . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**Article XIII**

  Savings Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Article XIV**

  Contract Reopener. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

**Article XV**

  Entire Agreement of the Parties. . . . . . . . . . . . . . . . . . . . . . 72
  Effective Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
  Illustrations and Definition of Piggybacking . . . . . . . . . . . 74
  Memorandum of Clarification / Sewage Plants . . . . . . . . . 75
  Letter re Competition Committee . . . . . . . . . . . . . . . . . . . . 76
  Work Continuation Program. . . . . . . . . . . . . . . . . . . . . . . . 77
  Uniform Drug / Alcohol Abuse Program . . . . . . . . . . . . . . 78

# INTRODUCTION

## MARBA ILLINOIS BUILDING AGREEMENT

This Agreement will provide the parties with the assurance that during the SIX (6) YEAR term of this Agreement a fair and honorable relationship will continue. This Agreement provides wage rates and fringe benefits commensurate with the skills and abilities of the workmen and also guarantees that the contractors will receive a service and cooperation in getting the job done.

You will note that this contract contains Agreements which were reached through understanding the problems of each of the parties by the method of free and honest collective bargaining. This Agreement now becomes part of our every day working relationship and it is yours to be administered wisely, adhered to in every respect and defended to the utmost of our ability.

## JOINT AGREEMENT

THIS AGREEMENT made and entered into the 1st day of June, 2001, by and between the Mid-America Regional Bargaining Association (MARBA) for and on behalf of the present and future members of its Member Associations, and the individual members thereof individually and their successors and assigns, as provided in Article I, Section 2, hereinafter for convenience, referred to as the "EMPLOYER", and the INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL UNION NO. 150, AFL-CIO, hereinafter, for convenience, referred to as the "UNION".

This Agreement shall cover the following named counties: Cook, DuPage, Grundy, Kane, Kankakee, Kendall, Lake, McHenry and Will Counties, all in Illinois.

This Agreement is based upon the understanding that the Employer and Union have a common and sympathetic interest in the Construction Industry. Progress in the

**SECTION 3 - SCOPE OF WORK** - This Agreement shall apply to work classifications and operations incidental thereto as are generally accepted as Building Construction such as:

Construction, erection, modification, addition to or improvement of a building structure or structures, the construction, erection, modification, addition to or improvement of an industrial plant or commercial construction and the driving of sheeting, piling, caisson work, slurry operations within and including the foundation area of a building, rapid transit stations and pump and lift station structures above connecting sewer lines, all excavating (except major excavation, back-filling, site preparation, site work and slurry operations outside of the building line), foundation work or dewatering or any work directly related to the aforementioned types of building construction including railroad spurs other than the main railroad right of way, assembly and dismantling of all equipment on the job site coming under the jurisdiction of the Operating Engineers

When a member of the bargaining unit is working within the scope of this Agreement and is required to work within the scope of another agreement the same day, the conditions and wages in the contract most beneficial to the employee shall prevail.

**Note:** See letter of clarification regarding sewage disposal plants.

**SECTION 4A - UNION SHOP** - All employees covered by this Agreement shall be obligated to become members of the Union after the seventh, but not later than the tenth day of employment, the date of the execution of this Agreement or the effective date of this clause, whichever occurs later, as a condition of continued employment. All employees who are members of the Union shall maintain their membership in the Union as a condition of continued employment. Any employee who fails to become a member of the Union or fails to maintain his membership in accordance with the foregoing shall forfeit his right of employment, and the Employer shall immediately discharge such employee upon receipt of written notice from the Union provided, however, that the foregoing shall be strictly interpreted, construed and applied in accordance with the applicable provision or provisions of the National Labor Relations Act, as amended.

**B.  MANAGEMENT RIGHTS**

The right to manage and conduct the business, including the right to determine what operations are to be conducted, the methods and means of all operations, to introduce new, improved or changed methods, equipment or facilities, to determine the machinery and equipment to be utilized, the right to hire, promote, manage and direct the work force, to schedule the days, hours and shifts of operation, to determine when overtime shall be worked, to layoff and recall employees, to curtail or close down any operation, to sell and dispose of all or any part of the Employer's assets, and to contract or subcontract work, except as specifically limited by this Agreement, are reserved solely to the Employer.

**SECTION 5 - JOB CONFERENCE** - Either party may request a job conference. The job conference must be held within five (5) days from date of request.

**SECTION 6 - BRANCHES OF WORK** - Except as hereinafter provided, the operation of all Engines and Boilers on Building and Construction work operated by Steam, Hydraulic, Electrical, Compressed Air, Gas or Gasoline, or any other motive power, including but not lim-

ited to Pumps, Pump Cretes, Stone Crushers, Air Compressors, Welding Machines, Conveyors, Cableways, Clamshells, Derrick Cars, Generators and Motors, Overhead Cranes, Orange Peel Buckets, Pile Drivers, Floating Derricks, Cranes, Locomotive Cranes, all Earth-Moving, Concrete and Blacktop Equipment, and all Elevators used for Building Construction or for alteration work, shall be the work of the Operating Engineer.

## SECTION 7 - SUCCESSOR/EMPLOYERS

A. SUCCESSOR EMPLOYERS: This Agreement, when executed by the parties herein, shall be binding upon the Union and Employer, their successor, heirs, executors, administrators, receivers in bankruptcy, receivers in equity, trustees or any such other equivalent designee.

B. NOTICE TO THE UNION: Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the events relating to the Employer, occurring after the date hereof.

1. Sale, assignment, transfer, or other change in name or ownership;

2. Formation of partnerships;

3. Termination of business;

4. Changes of name commonly used in business operation;

5. Change in form of business organization;

6. Incorporation of business;

7. Dissolution of corporation;

8. Name and business organization of successor;

9. Admission to or withdrawal from any association operating as a multi-employer bargaining agent.

## SECTION 8 - ASSIGNMENT OF WORK

a) The Employer hereby agrees to assign ALL work that is to be performed in the categories described in Article I, Section 3, Article VI, and/or Article VIII to employees in the bargaining unit covered by this Agreement.

b) The Employer, by entering into this Agreement hereby states and affirms that it is the Employer's preference to have ALL work identified or described in Article I, Section 3, Article VI, and/or Article VIII be performed by employees in the bargaining unit represented by the Union covered by this Agreement.

c) Grievances alleging a violation of this Section, based upon assignment of work to employees and or labor organizations not affiliated with the Building and Construction Trades Department A.F.L.- C.I.O. shall be processed through the Grievance Procedure in Article II of this Agreement and shall not be considered to be a jurisdictional dispute and thereby excluded from the Grievance Procedure.

d) The Employer agrees to compensate the bargaining unit member who would have worked but for the Employer's violation of this Section at the double (2x) time rate for all hours the bargaining unit member would have worked but for the Employer's violation.

## ARTICLE II

SECTION 1 - GRIEVANCES AND ARBITRATION - For the purpose of this Agreement, the term "grievance" is any claim or dispute involving an interpretation or application of the Agreement by an employee, or an Employer, or the Union, or the Association that one or the other of the aforesaid persons or organization is violating or had violated this Agreement.

All grievances shall be filed under the provisions of this Article.

**STEP ONE:** A grievance shall first be taken up between the Union's Business Representative assigned to the job and a designated representative of the Employer. The Union must file the grievance within forty-five (45) days of the date of occurrence giving rise to the grievance or when the affected employee knew or reasonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure.

The above forty-five (45) day limit may be waived for violations of Article V Section 1 - Starting Time - Work Day - Lunch Period and Article V Section 2 -Show-Up Time also, Article V Section 5 - Overtime/Holidays. The liability shall be for three (3) years of the violation, verified by audit. Audit fees shall be paid for by the Company, along with a 10% penalty payable to the Union.

**STEP TWO:** In the event the grievance cannot be resolved within seven (7) days working days of the STEP ONE conference, it shall be reduced to writing and referred for conference and resolution by designated officials of the Union and the Contractor at a pregrievance hearing to be held at the office of Local 150, 6200 Joliet Road, Countryside, Illinois, unless another location is mutually agreed to.

**STEP THREE:** In the event the grievance cannot be resolved by STEP TWO, the written grievance shall be submitted within fifteen (15) days to the Joint Grievance Committee created in this Article.

The Union and Association have together created a Joint Grievance Committee to resolve grievances arising under this Agreement. This committee shall consist of an equal number of members representing Employers and the Union. The Union or Association may appoint alternate members.

The Joint Grievance Committee has formulated rules of procedure to govern the conduct of its meetings and such rules for the processing of grievances as are not in conflict with this Agreement.

The Joint Grievance Committee shall have the power to resolve all grievances before it and shall have the right to examine all records of the Employers and employees as is reasonably necessary to resolve the grievance.

Where the Joint Grievance Committee, by majority vote resolves a grievance, no appeal may be taken and such resolution shall be final and binding on all parties and individuals bound by this Agreement.

If the Joint Grievance Committee is unable to resolve a grievance by majority vote, the grievance may be submitted within thirty (30) days to a neutral arbitrator. If the Union and the Association or the Employer, as the case may be, cannot agree on an arbitrator, then an arbitrator shall be selected in accordance with the rules and procedures of the American Arbitration Association. The cost of such arbitrator shall be borne equally by both parties to the arbitration; and the decision of the arbitrator shall be final and binding on all parties and individuals bound by this Agreement.

The time limits provided in this Section may be extended by mutual written consent of the Union and the Association and/or the Employer.

Neither the Joint Grievance Committee nor an arbitrator shall have any authority to add to, detract from, or in any way alter the provisions of this Agreement or make a new Agreement.

Decisions of the Joint Grievance Committee and arbitration awards shall be complied with within seven (7) days of receipt of the decision by the losing party. A party which fails to comply within the seven (7) day period shall be required to pay an additional ten (10) percent of all amounts owed as liquidated damages for failure to comply with the decision of award. In the event the prevailing party is required to file suit to enforce the decision or award, and it prevails, it shall be entitled to recover its costs, including attorneys' fees, from the losing party.

There shall be no lockout by an Employer during the term of this Agreement.

Except as provided in Article II, Sections 3 and 4 of this Agreement, there shall be no strikes or work stoppages by the Union during the term of this Agreement.

**SECTION 2 - BONDING OF EMPLOYER -** The Union may at its discretion demand a payment bond of any Employer guaranteeing payment of all earnings and/or other Fringe Benefit payments as provided for in this Agreement.

**SECTION 3 - PENALTY FOR FAILURE TO PAY WAGES OR FRINGE BENEFITS**

A - WAGES - If any Employer fails to pay wages, the arbitration procedure herein provided for shall become inoperative and the Union shall be entitled to resort to all legal and economic remedies, including the right to strike and picket until such failure to pay has been corrected.

This clause shall be inoperative if the amount of wages is bonafidely disputed. In such instance, the Employer shall then pay the wages admitted to be due and the balance shall be settled by the arbitration procedure as provided herein.

If an employee is not paid on the regular assigned pay day, the Employer shall pay penalty of four (4) hours a day

10

to such employee at the straight time rate of pay for each succeeding twenty-four (24) hours of delay. It is understood that said twenty-four (24) hour periods shall not include Sundays and holidays.

B. PENALTY FOR FAILURE TO PAY PENSION AND/OR HEALTH AND WELFARE AND/OR VACATION CONTRIBUTIONS AND/OR DUES CHECK OFF

If any Employer upon forty-eight (48) hours written notice of default to the Employer fails to pay pension or health and welfare or vacation or dues check off contributions, the arbitration procedure herein provided shall become inoperative and the Union shall be entitled to resort to all legal and economic remedies, including the right to strike and picket until such failure to pay has been corrected.

Disputes as to the effectiveness or validity of employee dues deduction authorizations shall not subject a contractor to any right to strike provided for in this Article. The Union must be advised specifically of any such dispute within forty-eight (48) hours of written notice.

**SECTION 4 - LEGITIMATE PICKET LINE -** It shall not be a violation of this Agreement and it shall not be a cause for discharge or disciplinary action in the event an employee refuses to enter upon any property involved in a legitimate labor dispute or refuses to go through or work behind any picket line, including the picket line of the Union party to this Agreement and including picket lines at the Employer's place or places of business. Furthermore, an employee may refuse to cross any picket line when he fears that bodily harm may be done to him.

**SECTION 5 - ACCESS TO PREMISES -** The duly authorized representative of the Union shall be allowed access to any job site or premises. If access is denied, the Union shall request an expedited grievance procedure by

11

fax or other written communication within forty-eight (48) hours with a fine of Ten Thousand Dollars ($10,000.00) per week. For this purpose it shall be the duty of the Employer to provide adequate passes, as requested by the Union, provided the Employer is able to do so.

## SECTION 6

A. NO DISCRIMINATION - It is understood and agreed that the Employer shall not discriminate against any member of the Union, any of its officers, its stewards, or any member serving as a member of a committee authorized by the Union. In the application of provisions of this Agreement, there shall be no discrimination by the Employer or the Union against any individual because of such individual's race, color, religion, sex, age or national origin. When the words in the masculine are used herein it shall include the feminine.

B. INSURANCE COVERAGE - For all employees covered by this Agreement, the Employer shall carry Worker's Compensation Insurance with a company authorized to do business under the applicable laws and regulations and shall in addition pay the tax necessary to secure for all such employees the benefits of the Illinois Unemployment Compensation Insurance Act, irrespective of the number of employees employed.

Upon forty-eight (48) hours written notice, the Union shall have the option to strike any Employer who does not comply with the above.

C. INSURANCE, SANITATION - The Employer must make adequate provision to comply with all the rules and laws pertaining to Insurance and Sanitation as are established by the statutes of the Federal, State, and Municipal Governments where the work is in progress.

D. OCCUPATIONAL INJURY - An employee who is injured on the job and is sent home, or to a hospital, or who

must obtain medical attention, shall receive pay at the applicable hourly rate for the balance of his regular shift on that day. An employee who has returned to his regular duties after sustaining a compensable injury who is required by the Company Worker's Compensation Doctor to receive additional medical treatment during his regularly scheduled working hours, shall receive his regular hourly rate of pay for such time.

SECTION 7 - HIRING - When an Employer performs work covered by this Agreement, the following shall apply:

The Employer will obtain all employees used in the performance of such work through the Referral Offices of the Local Union in accordance with the non-discriminating provisions governing the operation of the Local Union's Referral Offices set out in the current effective Addendum No. 1 to this Agreement as if set forth in full herein.

Furthermore, subsequent to referral and hire, the Employer will make and maintain all work assignments of preferred employees in full compliance with the provisions of said Addendum No. 1. Employer maintains the right to assignment of preferred employees to other assignments.

SECTION 8 - SUBCONTRACTOR - The Employer agrees that he will not contract or subcontract any work covered by the Scope of Work of this Agreement and/or work coming under the occupational jurisdiction of the Union to be done at the site of construction, alteration, painting, or repair of a building, structure, or other work, except to a person, firm or corporation, party to the applicable current labor agreement with the Union.

## ARTICLE III

SECTION 1 - JOB STEWARD - The job steward shall be selected by the Union from among the members of the

Bargaining Unit employed at the job site at the time of selection. The job steward shall be a working employee. The Union shall have the right to designate which employee shall be the steward or acting steward. The job steward shall have no special employment priority or security. In case of any minor difficulty, the steward shall be permitted reasonable time to adjust same without pay deduction.

**SECTION 2 - REGULAR ASSIGNED ENGINEERS -** The Engineers, or crew, regularly assigned to a piece of equipment shall be given preference when this piece of equipment is required to work, be repaired or moved (in accordance with Article V, Section 9 hereof) on a regular work day, Saturdays, Sundays, and Holidays, or other over-time.

**SECTION 3 - SHELTER AND SAFETY -** The Employer agrees that reasonable shelter and heat shall be provided for the Engineer and the machinery he operates. The Employer must make adequate provision to comply with all rules and laws as are established by the statutes of the Federal, State, Municipal Governments and American National Standard Institute, Inc., where the work is in progress.

**SECTION 4 - RADIATION DETECTION -** Employees required to wear a dosimeter radiation detection device will have an additional Fifty Cents ($.50) per hour added to their hourly rate of pay.

**SECTION 5 - TRANSPORTATION -** Whenever employees of the Bargaining Unit are employed in a mill, plant, refinery, terminal or other job site where they cannot supply their own transportation to the work area to which they are assigned, the Employer shall furnish transportation from the gate or entrance to their place of employment. All shifts shall start and end at a specified gate or entrance

14

for all employees for whom such transportation is furnished.

**SECTION 6 - NOTICE ON LEAVING JOB -** No employee shall leave his job without giving due notice to his Employer and the Union.

**SECTION 7 - DISCHARGE -** The Employer shall have the right to discharge any employee for just cause. The Employer shall notify the Union as soon as possible, but in no event later than the close of business on the second regular working day after such discharge.

## ARTICLE IV

## CRAFT FOREMAN

A Craft Foreman will be employed by the Employer where eight (8) or more employees in the Bargaining Unit are employed on any one shift at any one project or when the Employer is primarily engaged in the crane rental or equipment rental business, a Craft Foreman shall be employed at each yard or shop where eight (8) or more members of the Bargaining Unit work out of or receive their work assignments from. Crane rental Craft Foreman may be assigned maintenance work when such assignment does not interfere with other duties of the Craft Foreman.

An Assistant Craft Foreman shall be employed on any shift where there are thirty (30) through fifty (50) employees in the Bargaining Unit employed on any one project and for each additional thirty (30) employees or part thereof.

The Craft Foreman and Assistant Craft Foreman shall not operate equipment or do any repair work, except as set forth in this Section. The Craft Foreman and Assistant Craft Foreman will be designated by mutual agreement between the Union and the Employer, except when an employee has been in the continuous service of the

15

Employer (including affiliated companies, joint ventures and predecessors or successors of the Employer) for a minimum of ten (10) years.

The Craft Foreman will be the lead man of the employees in the Bargaining Unit. Such individual, however, shall neither have the authority to, nor shall he exercise any of the functions customarily exercised by supervisors within the meaning of the National Labor Relations Act, as amended. In no way shall such individual be deemed to be an agent of the Union.

The Craft Foreman shall be responsible for the general supervision of all operating engineers, apprentices, and oilers employed on the project. He shall regularly supervise the maintenance performed on all equipment to insure that proper servicing is accomplished daily. He shall maintain records (supplied by the Employer) indicating that regular preventative maintenance has been accomplished.

The Craft Foreman will be responsible for maintaining supply of oil and grease, cables and other spare parts and equipment essential for regular operation when such material is made available to him by the Employer or when given the necessary purchasing power to do so by the Employer.

The Craft Foreman may operate or repair equipment on an emergency basis in the event of illness, injury, or unexpected absence of the regularly assigned engineers or mechanic for one shift only. He shall, in addition, supervise the on-the-job training of Apprentices by Journeymen.

An Operating Engineer servicing and maintaining the following listed Class III machines -- Small Air Compressor 170 and under, Small Generator 50kw and under, Mechanical Heaters, 4 small Electric Winches Air Cooled Welding Machines, Pumps 3 inch and under and

portable conveyors, shall not be counted as employees in the Bargaining Unit in determining the number of men in the Bargaining Unit requiring a Craft Foreman.

The Craft Foreman shall remain on the project during the regular straight time hours if any members of the Bargaining Unit are working. The Craft Foreman shall remain on the project if four (4) or more employees in the Bargaining Unit are working overtime, except for the Class III machines listed in the previous paragraph.

The provisions shall apply to all shift work done pursuant to the terms of this Agreement.

## ARTICLE V

SECTION 1 - STARTING TIME - WORK DAY - LUNCH PERIOD

A. STARTING TIME - The regular starting time for a single shift operation, Sunday through Saturday, inclusive, shall be scheduled at one of the following hours: 7:00 a.m., 7:30 a.m. or 8:00 a.m. The Employer must establish a regular starting time at either 7:00 a.m., 7:30 a.m. or 8:00 a.m. If the Employer desires to change the established starting time, it shall be for a minimum of one week's duration beginning on Monday morning and the employees must be notified before the quitting time of the employee's last day of work prior to Monday of the change in the established starting time for the following Monday.

If there is a governmental agency requiring a different starting time, in which event such requirement shall be the controlling factor.

B. WORK DAY - Eight (8) hours shall constitute a normal day's work between the hours of 7:00 a.m. and 3:30 p.m., 7:30 a.m. and 4:00 p.m. or 8:00 a.m. and 4:30 p.m., as the case may be, pursuant to the established starting time as set forth in Section 1-A of this Article.

C. LUNCH PERIOD - There shall be a regularly scheduled lunch period for all one, two, and three shift operations. The lunch period shall be one-half (1/2) hour between the hours of 12:00 noon and 12:30 p.m. for the day shift, 8:00 p.m. and 8:30 p.m. for the afternoon shift, 4:00 a.m. and 4:30 a.m. for the night shift. On a three shift operation, the employees on all three shifts will work seven and one-half (7-1/2) hours and be paid for eight (8) hours with a half hour (1/2) lunch period at the time specified above. On a two shift operation, the employees on both shifts will work seven and one-half (7-1/2) hours and be paid for eight (8) hours with a half hour (1/2) lunch and it shall be taken at the midpoint of the shift, for which the employee shall be paid.

If the Employer requires an employee to work during his scheduled lunch period on a multiple shift operation, the employee shall be paid double (2) time for the lunch period in addition to his normal day's pay.

On a single shift operation if the Employer requires the employee to work during his scheduled lunch period, he shall be paid double (2x) time for the lunch period in addition to his normal day's pay.

SECTION 2 - SHOW-UP TIME - All employees shall be obligated to report for work each day Monday through Friday at the designated starting time, any notification to the contrary from the Employer to the Employee shall not relieve the Employer from the provisions of this Section. Employees laid off and re-hired within the same calendar week shall be paid the show up time (2 hours) for the days the employee was on lay off. The employee shall remain at the job site if so directed by the Employer or his representative. In the event the employee is held more than two (2) hours or is started to work at any time he shall receive a minimum of eight (8) hours pay and shall be paid pursuant to the following for all shifts Sunday through Saturday.

18

A. An employee who reports for work and is informed prior to 7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m., or 12:00 midnight, respectively, that he will not work that day shall receive two (2) hours pay.

B. An employee who reports for work and is informed prior to preparation time 6:30 a.m., 7:00 a.m., 7:30 a.m., 3:30 p.m., and 11:30 p.m. that he may not work that day and is released prior to 8:30 a.m., 9:00 a.m., 9:30 a.m., 5:30 p.m., and 1:30 a.m. and is not started to work shall receive two (2) hours pay.

C. An employee who reports for work and commences preparing his machine and is informed prior to 7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. and 12:00 midnight, that he may not work that day and is released prior to 9:00 a.m., 9:30 a.m., 10:00 a.m., 6:00 p.m. and 2:00 a.m. and is not started to work, shall receive one-half (1/2) hour at the overtime rate for preparation time and two (2) hours pay for show-up time.

D. An employee who is requested to report for work prior to the regular starting time (7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. and 12:00 midnight) and prior to the requested starting time is informed that he will not work that day, shall receive pay at the overtime rate for the hours prior to the regular starting time and two (2) hours pay for show-up time.

E. An employee who is requested to report for work prior to the regular starting time (7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. and 12:00 midnight) and held on the job more than two (2) hours after the regular starting time or is started to work at anytime after the requested starting time shall receive pay at the overtime rate for the hours prior to the regular starting time and eight (8) hours pay for the normal workday.

19

F. An employee held on the job more than two (2) hours or is started to work at anytime after the regular starting time (7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. and 12:00 midnight, respectively) shall receive a minimum of eight (8) hours pay plus the half hour (1/2) preparation time, when applicable. An employee who is requested to report or is called out after 7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. and 12:00 midnight, respectively, shall be paid back to 7:00 a.m., 7:30 a.m., 8:00 a.m., 4:00 p.m. or 12:00 midnight, respectively, plus the half hour (1/2) preparation time, when applicable, and such hours shall be counted as hours worked in computing overtime.

The above provisions shall be applicable to all shifts worked under the terms of this Agreement, except the 7:00 a.m., and 7:30 a.m. starting time shall apply to a single shift operation only. When an employee is requested to report for work on Saturdays, Sundays, or Holidays, he shall be paid pursuant to the provisions set forth in this Article, except he shall be paid at the double (2) time rate of pay.

## SECTION 3 - SHIFT WORK

A. When shift work is established, it must be predetermined as to what machines will be used on the shift work operation and may not be rescheduled on a day-to-day basis unless by mutual agreement between the Union and the Employer. There will be no changing from one machine to another as provided in Article V, Section 8 of this Agreement on a shift work operation.

In the event of a breakdown of a machine or an emergency involving the preservation of life or property, the Employer may change the employee(s) from one machine to another provided the Employer compensates the regularly assigned employee(s) at the overtime rate of pay for the remainder of such shift that the machine is being used.

20

An employee who has started to work and goes into overtime or works into another shift shall receive overtime until such individual has been released from work.

B. No shift work shall be established unless it is of three (3) days or more duration, except Class III equipment, otherwise, overtime shall prevail from 4:00 p.m. to 8:00 a.m. When shift work is established for a two (2) shift operation of employees working eight (8) hours each, the starting time for the shift shall be 8:00 a.m. for the day shift and 4:00 p.m. for the afternoon shift. When shift work is established for a three (3) shift operation, the starting time shall be 8:00 a.m. for the day shift, 4:00 p.m. for the afternoon shift and 12 midnight for the night shift. Then only single time shall be paid for shift work during weekdays. Where work is performed from 12:01 a.m. Saturday to 12:00 midnight Sunday, each shall be paid at the Double Time (2) rate of pay.

C. If shift work is on pumps or heaters and steam pumping or heating is necessary on the job, then each shift shall be entitled to Time and One-Half for Saturdays and Double Time for Sunday.

D. When pumping is required on a six (6) day basis from Monday through Saturday, inclusive, Double Time (2) shall be paid for Saturdays. This shall also apply to any heating done with mechanical heaters.

E. Where only two (2) shifts are required, and the Employer wishes the starting time advanced, a representative of the Union and a representative of the Employer shall meet and agree to the starting time for both shifts.

F. SHIFT PREMIUM - Employees working on the afternoon shift shall receive an additional Sixty-Five Cents ($0.65) effective June 1, 2001, Ninety Cents ($0.90) effective June 1, 2003 and One Dollar and No Cents ($1.00) effective June 1, 2006 per hour over the regular rate of pay.

21

Employees working on the night shift shall receive an additional Ninety-Five Cents ($0.90) effective June 1, 2001, One Dollar and Five Cents ($1.05) effective June 1, 2003 and One Dollar and Fifteen Cents ($1.15) effective June 1, 2006 per hour over the regular rate of pay.

SECTION 4 - NUMBER OF MEN - CONTINUOUS THREE (3) SHIFT OPERATION - It may be mutually agreed upon between the representative of the Employer and a representative of the Union that a rotating shift of four (4) men instead of three (3) men may be used when operating on a seven (7) day per week continuous three shift basis.

SECTION 5 - OVERTIME - HOLIDAYS

A. All overtime shall be paid to the next half (½) hour. All overtime shall be paid at the Double Time Rate (2), except as provided in Article V, Section 3, Subsection C.

Except brickfork operators servicing brick masons and operators on skidsteer loaders shall receive Time and One-Half (1½) the hourly rate for overtime. Brickfork operators servicing brick masons and operators on skidsteer loaders shall be paid the Double Time Rate (2X) for overtime when the craft being serviced is receiving the double time.

Employees assigned to brickfork servicing brick masons and employees assigned to skidsteer loaders will be paid straight time for Saturdays during a week when they have not worked or received wages for 40 straight time hours Monday through Friday. Brickfork operators servicing brick masons and skidsteer loader operators shall be paid Time and One-Half (1½) on Saturdays when the craft they are servicing is receiving Time and One-Half (1½).

B. HOLIDAYS - The following Holidays are designated as those for which Double Time (2) shall be paid: NEW YEAR'S DAY, DECORATION DAY, FOURTH OF JULY, LABOR DAY, THANKSGIVING DAY, AND CHRISTMAS

22

DAY. Holidays falling on Sunday shall be celebrated on Monday. If a holiday falls on a day other than a Sunday, it shall be celebrated on that date. No work shall be done on Labor Day, except to save life or property.

SECTION 6 - SEVERANCE PAY - When the services of an employee are no longer required, he shall receive a full day's pay for the day he is terminated and receive all of his wages before his quitting time or by certified mail postmarked within twenty-four (24) hours after his quitting time. If not paid within said twenty-four (24) hours, the Employer shall pay a penalty of four (4) hours of pay to such employee at the straight time rate of pay for each succeeding twenty-four (24) hours of delay. It is understood that said twenty-four (24) hour periods shall not include Sundays or Holidays. Employees shall not be called at home and terminated.

SECTION 7 - WAGE PAYMENT - Wages shall be payable in United States currency or checks at the option of the Employer, or by Direct Deposit at the option of the employee, and in no event shall the Employer withhold for more than five (5) days wages accruing prior to the payday. At the time of payment of wages, the Employer shall furnish the following information on the check stub or accompanying slip to each employee: regular hours worked and overtime hours worked and all deductions including contributions to the Vacation Fund shall be listed separately.

Payday shall be once a week on a specified day during work hours.

SECTION 8 - CHANGING FROM ONE MACHINE TO ANOTHER

A. Employees covered by this Agreement shall not be required to make more than one complete change on a single day shift operation from one machine to another and back to the original machine. If, in so doing, the rate

23

applicable to one machine is higher than that of another, the higher rate shall apply to and be paid for the full shift. All employees working on a multiple shift shall not be required to make a machine change, except as provided in Article V, Section 3, Subsection A.

B. In interpreting and applying this Article, it is understood and agreed that the language therein is not in any way to be interpreted as a limitation on the amount of work any employee is required to do, but only as a limitation on the number of machines such employee can be required to operate or service.

C. Any employee covered by this Agreement shall not be permitted to change to a machine that another employee covered by this Agreement has been employed to operate unless the latter has been discharged for just cause, and the Union has been notified of such discharge. However, if through no act or fault of the Employer, the Regular Assigned Employee is not available for work, this clause shall be inoperative.

**SECTION 9 - IDLE TIME - CLASS I AND CLASS II EQUIPMENT** - In case of a layoff, a machine must be left idle five (5) work days before another employee can be assigned to such machine. If such machine is reactivated before the five day period, the original employee shall be given first opportunity of employment on said machine. However, if such employee is not available, this paragraph shall be inoperative.

**CLASS III EQUIPMENT AND CLASS IV OILERS**

In case of a layoff a machine must be left idle two (2) work days before another employee can be assigned to such machine. If such machine is re-inactivated before the two (2) day period, the original employee shall be given first opportunity of employment on said machine.

24

---

However, if such employee is not available, this paragraph shall be inoperative.

**SECTION 10 - MAINTENANCE AND HEAVY DUTY REPAIR**

A. When the Employer is performing work covered by this Agreement and such Employer maintains a maintenance and repair shop, or shops, or does repair and equipment maintenance in the field, all employment and applications for employment for such work shall be in accordance with the terms and provisions of this Agreement. The Employer shall have the right to have specialized field and shop repair performed by service representatives of manufacturers or equipment dealers who provide such service.

1. Employees shall keep their equipment in good order and good repair at all times, and shall assist in field repair of same. In the event of a breakdown of equipment, the engineer and oiler, if one is assigned to the equipment, can be reassigned while it is being repaired only when members of the bargaining unit are assigned to perform the repair work.

2. If any repair work is to be performed by anyone other than a member of the bargaining unit, the operator and/or oiler shall assist said non-bargaining unit member with the repair, and shall remain with his assigned machine until all repair work is completed.

3. Unassigned machines shall come under the terms and conditions of number 2 above.

4. All lubing or any other servicing of equipment in the field will only be performed by members of the bargaining unit, including all Grease Trucks or other means of servicing equipment. When it has been traditionally and historically assigned by the Employer, lubing and any other ser-

25

vicing of equipment in the shop may be performed by a non-bargaining unit member.

On days when operators and oilers are called off or when repair work goes into overtime on a weekday, Saturday, Sunday or Holiday, only a bargaining unit mechanic may perform the repairs with no assistance. If another person is needed to assist, it shall be a member of the bargaining unit.

When warranty work is performed on new equipment, the operator and/or oiler may be reassigned.

The length of time warranty work can be performed by factory service representatives shall be limited to the original factory warranty period.

B. LOADING - The loading and unloading of all power-driven self-propelled equipment listed in the wage classifications of this Agreement when being moved by means of low-boy trailers, rail or water on the job site, from job site to job site, yard or shop to job site, etc., shall be deemed the work of the Operating Engineer and shall be covered by the terms of this Agreement. The Employer may at his discretion assign the employee(s) to act as an escort while such equipment is in transit.

**SECTION 11 - MECHANICS** - Mechanics shall furnish their own tools but shall not be required to furnish special tools such as: Pin Presses, Spanner Wrenches, Air or Electric Wrenches, Gear and Bearing Pullers, Electric Drills, Reamers, Taps and Dies, Oxyacetylene Hoses, Gauges, Torches and Tips, Twenty-Four inch (24") Pipe

26

Wrenches, over 3/4 inch drive socket set, Sockets over two inches (2"). If by mutual agreement, the mechanic is to use his personal pick-up or similar vehicle for the transporting of his tools, etc., on the job, or from job to job, he shall be compensated at not less than Six Hundred Twenty-Five Dollars ($625) per month plus all fuel and oil, and any additional insurance rider for said vehicle. In no event shall the furnishing of said vehicle be deemed as a condition of employment. Payment for vehicle rental shall be made each week on pay day, except in case of a layoff, it shall be as set forth in Article V, Section 6.

The Employer agrees to pay for or replace with equal quality any tools, (excluding hand tools guaranteed for life by the manufacturer), broken on the job by mechanics or anyone required to furnish their own tools. The Employer shall maintain an insurance policy or assume the cost risk, for loss of the employee's personal tools, or portion thereof, on Company premises, or job site, and while in the Company's utility truck, when due to the theft by break-in and entry, including fire and explosions or other circumstances that may happen on the Company premises, or job-site, and/or Company's utility truck. The Employer's liability for such loss shall not exceed the actual cost of the tools. It is understood that all employees must furnish the Employer with a complete inventory of the personal tools and their brand. It is further understood that whenever new tools are purchased, the employee must include them on the inventory list previously furnished, and whenever tools are removed, the inventory shall be reduced. If an employee does not supply the Employer with an inventory of tools, responsibility for replacement will not be that of the Employer. All replacement costs shall be paid within thirty (30) days of a reported loss. Employees must notify the Employer of a loss covered by the provision within three (3) days of knowledge of loss.

27

**SECTION 12 - DUTIES OF THE OILER -** It shall be the duty of the Oiler to keep the machine to which he is assigned thoroughly lubricated and reasonably clean, as instructed by the Engineer and to maintain the machine and assist in such work as directly affects the operation of the machine.

The Oiler shall be under the technical direction of the Engineer, perform such duties as he prescribes and remain at all times in close proximity to the machine.

The same rules and regulations regarding overtime and working conditions which apply to Engineers shall apply to Oilers.

## ARTICLE VI

**SECTION 1 - (A) - PREPARING EQUIPMENT -** Engineers on all cranes up to one cubic yard capacity and engineers operating all derricks and (¹*) all hoists listed in Class I of Article VIII hereof, and engineers on cranes of 20 ton lifting capacity or under, shall start 1/2 hour before the regular starting time including shift work to prepare the machine for its operation by oiling, greasing, maintaining and servicing the equipment and shall be paid for said 1/2 hour at the overtime rate.

Combination Backhoe Front Endloader machine with backhoe bucket capacity of less than one (1) cubic yard shall not be subject to preparation time. Combination Backhoe Front Endloader machine with backhoe bucket capacity of one (1) cubic yard or more shall be subject to preparation time. All Hydraulic Cherry Picker type machines under twelve (12) ton lifting capacity shall not be subject to preparation time. All Hydraulic Cherry Picker

(¹*) Single drum hoist of motive power of less than 6 horse-power will not require preparation time.

---

28

---

type machines of 12 ton lifting capacity to a gross vehicle weight up to 91,000 pounds shall be subject to preparation time, or oiler (apprentice) requirements, due to the introduction of new models of machines or due to the manufacturer's or Employer's de-rating or re-classification of any machine's size, lifting capacity, bucket capacity, or weight, a committee comprised of an equal number of representatives of the Union and the Association signatory hereto shall meet to make an equitable decision of the machine in question. In the event a majority decision cannot be reached, the dispute shall be processed pursuant to the Grievance and Arbitration Article of this Agreement.

B. Engineers on concrete conveyor systems will be present and assist when the conveyor system is being set up or dismantled, operated or moved. The Engineer will also maintain the generator running the system. An additional Engineer shall be required for each additional generator used and also an additional Engineer shall be used if the conveyor system is set up in sections on different levels and is not one continuous set of conveyors.

**SECTION 2 - MACHINERY OPERATION -** All Power Shovels, Backhoes, Draglines, Clamshells and Cranes used in work covered by this Agreement where such machinery is rated by the manufacturer as having a capacity of one (1) cubic yard or over, or over twenty (20) ton lifting capacity, Autograde, (²*) Formless Curb and

(²*) See letter of intent dated May 6, 1986.

---

type machines of 12 ton lifting capacity to a gross vehicle weight up to 91,000 pounds shall be subject to preparation time. All Hydraulic Cherry Picker type machines over 91,000 pounds gross vehicle weight shall require an Engineer and Oiler and/or Apprentice as the case may be. All Tieback machines less than sixty thousand 60,000 pounds capacity shall be subject to preparation time.

In the event a dispute arises over the applicability of preparation time,

---

29

Gutter Machine 36 inches in width and over, Roto Mill Grinder 36 inches in width and over, Slip-Form Paver, Concrete Paver 27E and over, Concrete Placing Booms, Central Mix Plants, Asphalt Plants, Batch Plants and Trenching Machine 30 inches or over, shall require an Engineer and Oiler (Apprentice), regardless of motive power.

All Lattice Boom Cranes originally manufactured after 1990 shall require an Engineer and an Oiler or Apprentice. All Lattice Boom Cranes originally manufactured prior to 1990 with an original lifting capacity of under 20 tons, shall require an Engineer, but shall not require an Oiler or Apprentice.

All Lattice Boom Cranes 20 tons and under manufactured prior to 1990, the Engineer shall receive one-half (1/2) hour grease time.

If another person is required on any of the above cranes, he shall be a member of the bargaining unit.

Hydraulic machines other than Front Endloaders that are designed to use bucket attachments of various sizes and the manufacturer rates such machine capable of handling buckets of two (2) cubic yards capacity or over, or if the machine working weight is in excess of eighty-seven thousand five hundred (87,500) pounds, or if the manufacturer's rated lifting capacity at a distance of twenty (20) feet from the vertical axis of the machine at ground level exceeds eighteen thousand (18,000) pounds such machine shall require an oiler. Machines that do not require an oiler pursuant to the above shall be subject to preparation time pursuant to Section 1(A) of this Article, with the exception of Combination Backhoe Front Endloader machine.

In the event machines of a new make, model, design, weight or capacity become available and a dispute arises in regard to the application of the foregoing, a committee

30

comprised of an equal number of representatives of the Union and the Association signatory herein shall meet and based on available information and the manufacturers specifications issue a majority decision.

In the event a majority decision cannot be reached, the dispute shall be processed pursuant to the Grievance and Arbitration Article of this Agreement.

On any machine not requiring an Oiler when a second man is used, such man shall be an employee of the bargaining unit.

Non-Lattice Boom Truck Cranes having three (3) axles or less shall not require an oiler. All Non-Lattice Boom Truck Cranes having four (4) axles or more, including dolly (dolly) shall count as an axle) shall require an engineer and oiler, except as heretofore limited.

SECTION 3 - MACHINE REFERENCE GUIDE - "Lifting capacity," capacity in cubic yards, manufacturers rating in pounds", and similar references to size, weight bucket capacity or performance of a machine or piece of equipment shall be determined by reference to Dataquest Green Guide. Such reference guide and the information contained therein with regard to the standard configuration of a specific piece of equipment or machinery shall be utilized, notwithstanding any modifications or alteration to the machine or piece of equipment.

SECTION 4 - LONG BOOM PAY - All Engineers operating cranes and derricks of all types with booms of ninety (90) feet to one hundred fifty (150) feet, including jib, shall be compensated an additional seventy-five cents ($.75) per hour over and above the regular wage scale for operating such crane. All Engineers operating cranes and derricks with booms of more than 150 feet, including jib, shall be compensated the aforementioned seventy-five cents ($.75) plus an additional twenty cents ($.20) per hour

31

over and above the regular wage scale for operating such crane for each additional ten (10) feet of boom or jib.

SECTION 5 - CAPACITY PAY - All Engineers operating cranes and derricks with a manufacturer's rated maximum capacity exceeding 50 ton shall be compensated two cents ($.02) per hour for each ton of the rated capacity in excess of 50 ton. Long Boom Pay Section 4 and Capacity Pay Section 5 and Premium Pay as provided for in Section 6 of this Article shall not be pyramided, but the highest rate shall prevail.

SECTION 6 - AUGERS AND DRILL RIGS - All Engineers operating crane mounted earth augers, raised or blind hole drills, and truck mounted drill rigs shall be compensated an additional Seventy-Five Cents ($.75) per hour over and above the regular wage scale for operating such equipment.

SECTION 7 - CRETER CRANES - Concrete conveyors mounted on rough terrain cranes (creter cranes) 18 ton and over shall require an engineer and oiler, less than 18 ton the engineer shall receive preparation time. When the creter crane is equipped with a conveyor system capable of extending seventy (70) feet or more, the engineer shall receive an additional fifty cents ($.50) per hour wage increase over and above the regular rate of pay for operating the creter crane.

SECTION 8 - TRUCK MOUNTED CONCRETE PUMPS - Truck mounted concrete pump operations shall require an operator. When such machine is equipped with a boom, which is capable of extending ninety (90) feet or more, the engineer shall receive an additional Fifty Cents ($.50) per hour wage increase over and above the regular rate of pay for operating the concrete pump.

SECTION 9 - TRUCK MOUNTED CONCRETE CONVEYORS - Truck mounted concrete conveyors opera-

32

tions shall require an engineer. When such machine with conveyors that are capable of extending ninety feet (90') or more, the engineer shall receive an additional fifty cents ($.50) per hour wage increase over and above the regular rate of pay for operating the conveyors. In the event this machine is used for handling materials other than concrete, the same wage rates and conditions shall apply.

SECTION 10 - HELICOPTERS - The use of helicopters (external loads) under the terms of this Agreement shall require a three (3) man crew, one (1) pilot and two (2) controllers. The pilot and controllers must have direct radio communications during the actual hoisting operation. The crew shall receive the hourly wage rate set forth in this Agreement for crane operators, and in addition, the pilot shall receive long boom pay up to a maximum length of 500 feet.

SECTION 11 - BRICK FORKLIFTS - Employees operating Brick Forklifts servicing less than ten (10) bricklayers, except when unloading material or doing industrial work shall receive Class III rate of pay for that day. Employees operating Brick Forklifts servicing ten (10) or more bricklayers or unloading material or doing industrial work shall receive Class IV rate of pay. (See Article V, Section 5 A.)

SECTION 12 - BOBCATS - Bobcats and/or other skid-steer machines of a like nature that are designed to use bucket attachments of various sizes and the manufacturer rates such machine capable of handling buckets of three-fourth (3/4) cubic yard or under, such machine shall be in Class II wage category, except when used on housing and commercial work it shall be Class III wage category.

Bobcats and/or other skid-steer machines of a like nature that are designed to use bucket attachments of various sizes and the manufacturer rates such machine capa-

33

ble of handling buckets of over three-fourth (3/4) cubic yard, such machine shall be in Class IV wage category. (See Article V, Section 5 A.)

**SECTION 13 - TIEBACK MACHINES** - Tieback machines rated by the manufacturer to have a working weight of 60,000 pounds or more and/or custom built tieback machines with a working weight of 60,000 pounds or more shall require an oiler regardless of motive power.

Tieback machines rated by the manufacturer to have a working weight of less than 60,000 pounds and/or custom built tieback machines with a working weight of less than 60,000 pounds shall be subject to the preparation time clause Article VI, Section 1 of the Agreement regardless of motive power.

**SECTION 14 - ELEVATORS -** Double elevators of all types shall not require an engineer on each car in use.

Elevators of all types shall require an engineer as set on below:

1. Outside type rack and pinion and similar machines, Class I.

2. When new construction becomes substantially complete, and an occupancy permit is issued by the governing agency, the inside elevator operator rate may be reduced by the Employer to Class III.

3. After a building has been completed and the initial construction contract is over, new tenant construction build out work may be performed under Class IV.

4. An operating engineer shall be employed on automatic elevators on rehab and/or tenant build out work, if such work exceeds 30,000 square feet. Such operator shall receive a minimum of Class IV wage

34

up to 50,000 square feet. In excess of 50,000 square feet, the operator shall receive Class III wages.

When an operator is receiving Class III or Class IV wages, his overtime shall be at the rate of 1.5 his regular rate of pay Monday through Saturday. Sundays and holidays shall be compensated at two (2X) times the rate of pay.

This Section shall apply to elevators used to transport construction materials, supplies and equipment.

Nothing in this Section shall prevent craft employees carrying hand tools from using other available elevator service at the site or project.

**SECTION 15 - BOBCATS, SKIDSTEER LOADERS, FORKLIFTS SERVICING BRICK MASONS AND DRILLS.**

1. The operation of Bobcats and Skidsteer Loaders shall be assigned to Operating Engineers, except as otherwise provided herein. Bobcats and Skidsteer Loaders, including those machines equipped with small jackhammers (pencil breakers) may be assigned to Laborers for the following work:

(A) building demolition work (inside the structure).

(B) minor excavation such as curb tear out, replacement and back filling.

(C) raising, lowering or movement of manholes.

(D) residential concrete work using one bobcat/skidsteer loader. If more than one machine is used, additional machines shall be assigned to Operating Engineers.

2. Forklifts and bobcats with pallet fork attachments serving eight (8) or more brick masons on commercial projects shall be operated by Operating Engineers. Forklifts and bobcats with pallet attachments serving seven (7) or

35

fewer brick masons on commercial projects may be assigned to Laborers.

3. Drilling operations using air track type machines shall be the jurisdiction of the Laborers. Drills where compressor units do not supply the power in the operation of the drill, shall be the jurisdiction of the Operating Engineers.

4. The provisions of this Section shall become effective June 1, 1995. Employers who have traditionally assigned any of the above described bobcat and skidster loader operations to Laborers shall not be required to reassign such work to Operating Engineers but shall assign such work to Operating Engineers as the Laborer employees of the Employer currently assigned to such work leave the employ of the Employer through termination or retirement. Upon request, the Employer shall provide a list of the jurisdictional disputes thereby excluded from the Grievance Procedure.

5. Grievances alleging violations of this Section 15 shall be processed through the Grievance Procedure in Article II of this Agreement and shall not be considered to be jurisdictional disputes thereby excluded from the Grievance Procedure.

SECTION 16 - SMALL EQUIPMENT - An Operating Engineer servicing and maintaining the following listed Class III machinery; Small Air Compressors, Small Generators, Small Electric Winches, Welding Machines and Sump Pumps Three (3) inch or under - shall not be required to maintain more than a total of five (5) such machines of the same type, except Small Electric Winches for which the total number maintained shall not be more than four (4), nor shall employees be required to service

36

and maintain more than a total of five (5) of the above listed machines in combination. When employees of the Bargaining Unit are employed to service and maintain mechanical heaters, such employees shall not be required to service and maintain more than a total of five (5) such heaters. Where a member of the bargaining unit is required to service and maintain more than a total of five (5) heaters, such employee shall be compensated at the Class I rate of pay negotiated for Crane Operators in this Agreement. Assignment of such machines shall not exceed a total of eight (8). An Engineer shall not be required on one (1) small heater of less than 250,000 B.T.U.

SECTION 17 - SMALL CATEGORY EQUIPMENT ASSIGNMENT

A. In the event that the Employer uses not to exceed a total of three (3) of the following listed small Class III equipment in any combination on a job site where members of the Bargaining Unit are employed by the Employer:

1. Small pumps 3" or under doing intermittent pumping

2. One welding machine

3. Single light Plant (50kw and under)

4. Three air cooled welding machines

5. One similar piece of equipment

A member of the Bargaining Unit shall be assigned and compensated at the rate of ($.50) per hour for the entire shift over and above the negotiated rate.

B. In the event an Employer uses any of the following (B)1, (B)2, or (B)3 on a job site where members of the Bargaining Unit are employed by the Employer:

1. One (1) air compressor of 250 c.f.m. or under

37

2. One (1) to eight (8) electric submersible pumps not to exceed three (3) inches each

3. One (1) or two (2) four (4) inch electric submersible pumps a member of the Bargaining Unit shall be assigned and compensated at the rate of ($.50) per hour for the entire shift over and above the negotiated rate.

C. In the event that there are no members of the Bargaining Unit employed by the Employer on the job site, the Employer shall have the right to operate equipment as listed in any one (only) of the above listed A-1, A-2, A-3, A-4, A-5, or B-1, B-2, or B-3 until such time as members of the Bargaining Unit are employed by the Employer on the job site, but in no event is work coming within the jurisdiction of the Bargaining Unit to be permanently assigned to any other employee.

## SECTION 18 - ELECTRIC SUBMERSIBLE PUMPS - JOB SITES OR PROJECTS

(A) On a job site where more than eight (8) three inch (3") in diameter or less electric submersible pumps are being used, the Employer shall require a full time Pump Operator at the Pump Wage Rate, to provide for the operation and maintenance of said pumps, during the entire regular daytime shift - Monday through Friday and on such other days as the regular daytime crew are conducting full scale operations. No other operator shall receive premium pay. In the event of a breakdown in any Pumps, the assigned operator shall be subject to call at anytime and any day to assist in the installation, servicing or removal and re-location of said pumps. In such breakdown case, the Employer shall notify the Operator by telephone to report to the job site, if available for said duty. An employee shall not be required to operate and maintain more than a total of 75" discharge.

When a discharge exceeds 75" or when the Combination of A & C does not apply the Employer shall require a second full time pump operator - Monday through Friday on the same basis as stated above. However, the Employer may assign the second pump operator to the second shift. It is further understood when the two (2) aforementioned pump operators are employed the total inches of discharge may be increased to 175".

When a discharge exceeds 175" the Employer shall require a third full time pump operator - Monday through Friday on the same basis as stated above. However, the Employer may assign the third pump operator to the third shift.

The conditions set forth herein for the first pump operator are also applied to the second and third pump operators respectively.

(B) In the event that the Employer uses electric submersible pumps three inches (3") in diameter or less not to exceed a total of eight (8) such pumps and a member of the Bargaining Unit is being utilized on the site, the member shall be assigned to the pumps and shall be compensated at the rate of fifty cents ($.50) per hour for the entire shift over and above the members negotiated rate of pay. An employee shall not be required to operate or maintain more than a total of 15" discharge.

(C) In the event the Employer uses one (1) or two (2) four inch (4") electric submersible pumps and a member of the Bargaining Unit is being utilized on the site, the member shall be assigned to the pumps and shall be compensated at the rate of fifty cents ($.50) per hour for the entire shift over and above the members negotiated rate of pay. An employee shall not be required to operate and maintain more than a total of 8" discharge.

(D) In the event the Employer uses more than one (1) or two (2) four inch (4") electric submersible pump or any electric submersible pump larger than four inches (4") in diameter a full time pump operator shall be required Monday through Friday on each shift when pumps are in operation and on such other days as the regular crew is conducting full scale operations to provide for operation and maintenance of such pump or pumps. An employee shall not be required to operate and maintain more than 150' discharge.

## COMBINATION A & C

An employee may be assigned to operate and maintain a combination of A & C pumps above. Such employee shall be compensated at the rate of fifty cents ($.50) per hour for the entire shift over and above the negotiated pump rate of pay.

## COMBINATION D & B

An employee may be assigned to operate and maintain a combination of D & B pumps above. Such employee shall be compensated at the rate of fifty cents ($.50) per hour for the entire shift over and above the negotiated rate of pay.

**SECTION 19 - ELECTRIC SUBMERSIBLE PUMPS - TUNNELS, ETC.** - The Employer shall require a full time pump operator when B or C of Section 15 above is exceeded and the job or project is minus 100' in depth as per the specifications, bench mark, etc., to operate and maintain electric submersible pumps used on tunnels, shafts, and other underground enclosed work, during the entire daytime shift - Monday through Friday and on such other days as the regular daytime crew are conducting full scale job operations. No other operator shall receive premium pay or be required on the other two shifts in the 24 hour day, except when the total pump discharge on the project

40

exceeds 30". In this case, a second pumpman shall be assigned to the second shift - Monday through Friday and on such other days as the regular second shift crew are conducting full scale job operations.

In the event the total pump discharge on the project exceeds 60" a third pump man shall be assigned to the third shift - Monday through Friday and on such other days as the regular third shift crew are conducting full scale job operations.

When pumps require IN LINE service and maintenance such work will be performed by the normal shift pump operator. When pumps require repair or rebuilding, beyond normal warranty work, such work shall be the work of the mechanics.(3")

## ARTICLE VII

**SECTION 1 - BOILER PLANTS -** All Boiler Plants used for power by the Employer for Building Construction Work shall be in charge of a Hoisting Engineer, except when steam or power is furnished from an existing plant. None of the foregoing shall apply to steam for temporary heating purposes, except as provided by the Board of Jurisdictional Awards.

**SECTION 2 - WASHING BOILERS -** Engineers shall wash out boilers when necessary in the opinion of the Employer and shall receive the regular scale of wages. Firemen shall be placed on boilers coming within the jurisdiction of the Bargaining Unit, and such Firemen shall take orders from and be responsible to the Engineer in charge of the plant.

The same rules and regulations regarding overtime and working conditions which apply to Engineers shall apply to Firemen.

(3") See Illustration and definition attached to the back of Contract.

41

**SECTION 3 - CONCRETE MIXER -** The Employer shall not operate more than one (1) Concrete Mixer of one (1) bag capacity with side loader on the job unless the same is operated by an employee in the Bargaining Unit, or any Concrete Mixer with skip hoist or side loader attached, regardless of horsepower with the exception of the 7-S size and under, unless the same is operated by an employee in the Bargaining Unit and all equipment so operated shall be covered by such employee.

**SECTION 4 - HOISTS -** Except small electric drill winches regardless of the horsepower used for Hoisting Materials shall be operated by employees in the Bargaining Unit. Where four (4) or more of the electric winches are used on one job, an Engineer shall be employed to cover them and an additional Engineer for each four (4) thereafter.

It is understood that one (1) automatic reciprocating hoist used on buildings not over 50 feet in height above the grade line, said 50 feet to be exclusive of penthouse, parapet wall or chimney above the roof, shall not require an Engineer.

If more than one Automatic Hoist is used on the same building or a group of buildings, then one Engineer shall be employed for the first two (2), three (3), four (4), or five (5) hoists, as the case may be, and thereafter an Engineer shall be employed for each five (5) additional hoists, or portion thereof.

On all automatic hoists over 50 feet in height, as described, an Engineer must be utilized.

**SECTION 5 - GENERATORS -** Generators 50kw and over used to operate equipment equipped with electric motors such as, but not limited to, Crushers and Hammerhead Cranes shall have a Class III operator assigned to maintain the generator.

42

## ARTICLE VIII

**SECTION 1 - WAGE RATES AND FRINGE BENEFITS -** The wage rates and fringe benefits for the respective classifications set forth below shall be effective on the dates indicated:

| FRINGE BENEFITS | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| HEALTH AND WELFARE | $5.15 | $5.40 | $5.70 | $6.05 | $6.45 | $6.85 |
| PENSION | $4.00 | $4.25 | $4.50 | $4.85 | $5.15 | $5.60 |
| VACATION SAVINGS | $1.60 | $1.70 | $1.80 | $1.80 | $1.80 | $1.90 |
| APPRENTICESHIP | $ .45 | $ .50 | $ .55 | $ .60 | $ .65 | $ .70 |
| INDUSTRY ADVANCEMENT FUND and CONSTRUCTION INDUSTRY RESEARCH AND SERVICE TRUST FUND | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 |
| **WAGES** | **6/1/01** | **6/1/02** | **6/1/03** | **6/1/04** | **6/1/05** | **6/1/06** |
| CRAFT FOREMAN | $36.05 | $37.85 | $39.70 | $41.60 | $43.55 | $45.55 |
| ASSISTANT CRAFT FOREMAN | $35.80 | $37.60 | $39.45 | $41.35 | $43.30 | $45.30 |
| [4] CERTIFIED FRICTION CRANE OPERATOR MECHANICS AND WELDERS | $35.05 | $36.85 | $38.70 | $40.60 | $42.55 | $44.55 |

[4] City of Chicago Crane License and/or Local 150 Advanced Crane Certification

43

| | | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|---|
| 5 | CERTIFIED CRANE OPERATOR REQUIRING AN OILER | $34.05 | $35.85 | $37.70 | $39.60 | $41.55 | $43.55 |
| | GRADALL | $33.05 | $34.85 | $36.70 | $38.60 | $40.55 | $42.55 |
| 6 | CERTIFIED CRANE OPERATOR REQUIRING NO OILER | $33.05 | $34.85 | $36.70 | $38.60 | $40.55 | $42.55 |

| **CLASS I** | | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|---|
| 7 | ASPHALT PLANT | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | ASPHALT SPREADER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | AUTOGRADE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | BACKHOES WITH CAISSON ATTACHMENT | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | BATCH PLANT | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | BENOTO (requires two engineers) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | BOILER AND THROTTLE VALVE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |

5 City of Chicago Crane License and/or Local 150 Advanced Crane Certification
6 City of Chicago Crane License and/or Local 150 Advanced Crane Certification
7 Requires Oiler

| | | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|---|
| 7 | CAISSON RIGS | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | CENTRAL REDI-MIX PLANT | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | COMBINATION BACKHOE FRONT ENDLOADER MACHINE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | COMPRESSOR AND THROTTLE VALVE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | CONCRETE BREAKER (Truck Mounted) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | CONCRETE CONVEYOR | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | CONCRETE CONVEYOR (Truck Mounted) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | CONCRETE PAVER OVER 27E cu. ft. | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | CONCRETE PAVER 27E cu.ft. and UNDER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 | CONCRETE PLACER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | CONCRETE PLACING BOOM | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| | CONCRETE PUMP (Truck Mounted) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |

7 Requires Oiler

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| CONCRETE TOWER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 8 CRANES, ALL NON-CERTIFIED | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 CRANES, HAMMERHEAD | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| CRANES (GCI and similar type-requires two operators only) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| CRETER CRANE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| CRUSHER, STONE, etc. | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| DERRICKS, ALL | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 DERRICKS, TRAVELING | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 8 FORMLESS CURB AND GUTTER MACHINE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| GRADER, ELEVATING | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| GROUTING MACHINES | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| HIGHLIFT SHOVELS OR FRONT ENDLOADERS 2-1/4 yd. and over | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| HOISTS, ELEVATORS, outside type rack and pinion and similar machines (refer to Article VI, Section 14) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |

46

7 Requires Oiler
8 Requires Oiler pursuant to Article VI, Section 2.

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| HOISTS, ONE, TWO AND THREE DRUM | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| HOISTS, TWO TUGGER ONE FLOOR | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 8 HYDRAULIC BACKHOES | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| HYDRAULIC BOOM TRUCKS | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| HYDRO VAC (and similar equipment) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| LOCOMOTIVES, ALL | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| MOTOR PATROL | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 8 PILE DRIVERS AND SKID RIG | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| POST HOLE DIGGER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| PRE-STRESS MACHINE | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7 PUMP CRETES DUAL RAM (requiring frequent lubrication and water) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| PUMP CRETES: Squeeze cretes screw type pumps, Gypsum Bulker and pump | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |

47

7 Requires Oiler
8 Requires Oiler pursuant to Article VI, Section 2.

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| 9  RAISED AND BLIND HOLE DRILL | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7  ROTO MILL GRINDER (36" and over) | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| ROTO MILL GRINDER (less than 36") | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| SCOOPS -- TRACTOR DRAWN | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 7  SLIP FORM PAVER | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| STRADDLE BUGGIES | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| TOURNAPULL | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| TRACTOR WITH BOOM, and side boom | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |
| 9  TRENCHING MACHINES | $32.05 | $33.85 | $35.70 | $37.60 | $39.55 | $41.55 |

| CLASS II | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| BOILERS | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| BROOM, ALL POWERED PROPELLED | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| BULLDOZERS | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |

7 Requires Oiler
9 To be manned pursuant to the letter dated May 2nd, 1977

48

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| CONCRETE MIXER (two bags and over) | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| CONVEYOR, PORTABLE | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| FORKLIFT TRUCKS | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| GREASER ENGINEER | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| HIGHLIFT SHOVELS OR FRONT ENDLOADERS UNDER 2-1/4 yd. | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| HOISTS, AUTOMATIC | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| HOISTS, Inside Elevators (refer to Article VI, Section 14) | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| HOISTS, SEWER DRAGGING MACHINE | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| HOISTS, TUGGER SINGLE DRUM | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| 10  LASER SCREED | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| ROCK DRILL (self-propelled) | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |

49

10 These Wage Classifications become effective June 1, 2001 and apply only where Employers have determined to assign the operation of such machinery to employees represented by Local 150.

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| [7] ROCK DRILL (Truck Mounted) | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| ROLLERS, ALL | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| STEAM GENERATORS | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| TRACTORS, ALL | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| [11] TRACTOR DRAWN VIBRATORY ROLLER | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |
| WINCH TRUCKS with "A" Frame | $30.75 | $32.55 | $34.40 | $36.30 | $38.25 | $40.25 |

| CLASS III | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| AIR COMPRESSOR - Small 250 and under (1 to 5 not to exceed a total of 300 ft.) | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| AIR COMPRESSOR – Large over 250 | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| COMBINATION – Small equipment operator | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |

[7] Requires Oiler

[11] Vibratory Roller - An additional fifty cents ($0.50) per hour plus the hourly wage rate of the machine pulling such Roller.

| | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| GENERATORS – Small 50kw and under | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| GENERATORS-Large over 50kw | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| HEATERS, MECHANICAL | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| HOISTS, INSIDE ELEVATORS (Remodeling or Renovation work Refer to Article VI, Section 14) | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| HYDRAULIC POWER UNITS (pile driving, extracting and drilling) | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| [12] LOW BOYS | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| PUMPS, over 3" (1 to 3 not to exceed a total of 300 ft.) | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| PUMPS, WELL POINTS | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |

[12] These Wage Classifications become effective June 1, 2001 and apply only where Employers have determined to assign the operation of such machinery to employees represented by Local 150.

|  | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| WELDING MACHINES (2 through 5) | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |
| WINCHES, 4 small electric drill winches | $28.20 | $30.00 | $31.85 | $33.75 | $35.70 | $37.70 |

| CLASS IV | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| BOBCATS AND/OR OTHER SKIDSTEER LOADERS | $26.45 | $28.25 | $30.10 | $32.00 | $33.95 | $35.95 |
| BRICK FORKLIFTS | $26.45 | $28.25 | $30.10 | $32.00 | $33.95 | $35.95 |
| OILERS | $26.45 | $28.25 | $30.10 | $32.00 | $33.95 | $35.95 |

52

**HAZMAT PAY**
Level A                    Add $3.00 to Classification
Level B                    Add $2.00 to Classification
Level C                    Add $1.00 to Classification

**SECTION 2**
**FRINGE BENEFITS FOR FIRST AND SECOND YEAR APPRENTICES**

| FRINGE BENEFITS | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| HEALTH AND WELFARE | $5.15 | $5.40 | $5.70 | $6.05 | $6.45 | $6.85 |
| PENSION | $2.45 | $2.70 | $2.95 | $3.30 | $3.60 | $4.05 |
| VACATION | $ .85 | $ .95 | $1.05 | $1.05 | $1.05 | $1.15 |
| APPRENTICESHIP | $ .45 | $ .50 | $ .55 | $ .60 | $ .65 | $ .70 |
| INDUSTRY ADVANCEMENT FUND and CONSTRUCTION INDUSTRY RESEARCH AND SERVICE TRUST FUND | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 |

**FRINGE BENEFITS FOR THIRD AND FOURTH YEAR APPRENTICES**

| FRINGE BENEFITS | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| HEALTH AND WELFARE | $5.15 | $5.40 | $5.70 | $6.05 | $6.45 | $6.85 |
| PENSION | $4.00 | $4.25 | $4.50 | $4.85 | $5.15 | $5.60 |
| VACATION | $1.60 | $1.70 | $1.80 | $1.80 | $1.80 | $1.90 |
| APPRENTICESHIP | $0.45 | $0.50 | $0.55 | $0.60 | $0.65 | $0.70 |
| INDUSTRY ADVANCEMENT FUND and CONSTRUCTION INDUSTRY RESEARCH AND SERVICE TRUST FUND | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 | $ .18 |

53

| WAGES FOR APPRENTICES | 6/1/01 | 6/1/02 | 6/1/03 | 6/1/04 | 6/1/05 | 6/1/06 |
|---|---|---|---|---|---|---|
| First Year | $15.45 | $16.35 | $17.30 | $18.25 | $19.25 | $20.30 |
| Second Year | $19.70 | $20.85 | $22.05 | $23.30 | $24.55 | $25.85 |
| First half of Third Year | $22.70 | $24.05 | $25.45 | $26.85 | $28.35 | $29.85 |
| Second half of Third Year | $24.20 | $25.65 | $27.15 | $28.65 | $30.20 | $31.80 |
| First half of Fourth Year | $25.75 | $27.25 | $28.85 | $30.45 | $32.10 | $33.80 |
| Second half of Fourth Year | $27.25 | $28.85 | $30.50 | $32.25 | $34.00 | $35.80 |

At the end of the fourth year, Apprentices shall become Journeymen Engineers and shall be paid pursuant to the terms of the wage classifications set forth in this Agreement.

In no event shall the rate of pay for apprentices exceed that rate provided for the classification of machine the apprentice may be operating as contained in Article VIII of this Agreement.

Apprentices shall be paid according to the Apprenticeship Introduction Slip issued to the Employer and the Apprentice at the time the apprentice is dispatched by the Union to the Employer.

The Introduction Slip must indicate the progress status of the apprentice. As the Apprentice progresses in status, he shall be paid pursuant to the rates set forth in this Agreement.

In addition to the above provisions for rates of pay, fringe benefit contributions shall be as provided for in this Agreement covering work being performed by said Apprentices.

SECTION 2.1 - SPECIALIZED TRAINING - The Employer agrees to pay for specialized training as required by individual owners or government agencies to include all tuition, fees, books and other expenses as well as the wages for time spent in direct training (i.e. HAZMAT or specialized safety training), CDL and re-certifications are not included.

SECTION 2.2 ESTABLISHMENT OF JOINT LABOR MANAGEMENT COMMITTEE FOR CERTIFICATION. TRAINING/TESTING DATA BASE - The Parties agree to establish a Labor Management Committee to develop and implement a program whereby Operating Engineers will be certified as being competent to operate most of the types of equipment covered by this Agreement. The Labor

54

Management Committee created under this provision shall establish the standards and criteria for certification of competency. The Labor Management Committee will have the authority to add new equipment to the certified Operator list, when mutually agreed to. The premium pay for all additional certified classifications will be $1.00 per hour over the regular hourly rate.

A website will be developed and implemented to validate testing and training of the bargaining unit members.

SECTION 3 - NEW AND UNLISTED EQUIPMENT - It is mutually agreed between the Union and the Association to meet and discuss on wage rates and manning requirements for all new and unlisted equipment which is not listed in this agreement but that the Union claims under the jurisdiction of International Union of Operating Engineers. Upon written notification of the Association and the contractor by the Union, the parties shall meet to discuss all such matters within twenty-one (21) days from the date of notification. If the parties are unable to resolve such matters, the matter may be submitted within thirty (30) days to a neutral arbitrator. If the Union and the Association and/or Employer cannot agree on an arbitrator, then an arbitrator shall be selected in accordance with the rules and procedures of the American Arbitration Association and the arbitration shall be conducted under and in accordance with such rules and procedures. The cost of such arbitration shall be borne equally by both parties to the arbitration; and the decision of the arbitrator shall be final and binding on all parties and individuals bound by this Agreement. The time limits provided in this Section may be extended by mutual written consent.

SECTION 4 - JURISDICTIONAL DISPUTES
A. ALL COUNTIES (EXCLUDING COOK) - The parties to this Agreement are subject to and agree to be bound

55

by all decisions, awards and provisions of the Agreement establishing the Impartial Jurisdictional Disputes Board, or its successor that is acceptable to the Building and Construction Trade Department of the AFL-CIO and the International Union of Operating Engineers, including, but not limited to, the plan for the settlement of jurisdictional disputes in the construction industry. There is to be no work stoppage by either party while an award is pending.

B. COOK COUNTY - It is understood and agreed that the parties to this Agreement shall be bound to the provisions of the Standard Agreement establishing the Joint Conference Board as if set forth in full herein.

## ARTICLE IX

SECTION 1 - WELFARE FUND - Effective June 1, 2001, the Employer shall pay FIVE DOLLARS AND FIFTEEN CENTS ($5.15) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2001, the Employer shall pay FIVE DOLLARS AND FIFTEEN CENTS ($5.15) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2002, the Employer shall pay FIVE DOLLARS AND FORTY CENTS ($5.40) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2002, the Employer shall pay FIVE DOLLARS AND FORTY CENTS ($5.40) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2003, the Employer shall pay FIVE DOLLARS AND SEVENTY CENTS ($5.70) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2003, the Employer shall pay FIVE DOLLARS AND SEVENTY CENTS ($5.70) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2004, the Employer shall pay SIX DOLLARS AND FIVE CENTS ($6.05) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2004, the Employer shall pay SIX DOLLARS AND FIVE CENTS ($6.05) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2005, the Employer shall pay SIX DOLLARS AND FORTY-FIVE CENTS ($6.45) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2005, the Employer shall pay SIX DOLLARS AND FORTY-FIVE CENTS ($6.45) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2006, the Employer shall pay SIX DOLLARS AND EIGHTY-FIVE CENTS ($6.85) per hour for each hour for which the employee receives wages under the terms of this Agreement into the Midwest Operating Engineers Welfare Fund.

Effective June 1, 2006, the Employer shall pay SIX DOLLARS AND EIGHTY-FIVE CENTS ($6.85) per hour for each hour worked by a Supervisor covered by this Agreement into the Midwest Operating Engineers Welfare Fund.

The Welfare Fund maintains a place of business at 6150 Joliet Road, Countryside, Illinois 60525, or at such other place designated by the Trustees. Contributions of the Employer shall be forwarded to such business office together with report forms supplied for such purpose not later then the tenth (10th) day of the following month.

Contributions to the aforesaid Health and Welfare Fund shall not constitute or be deemed wages due to the employee.

It is understood and agreed that the Employer shall be bound to the terms and provisions of the Agreement and Declaration of Trust of the Midwest Operating Engineers Welfare Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

If payment for contributions as defined above is not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement and shall be liable for contributions due, liquidated damages, interest, and any other cost of collection.

Anything herein contained to the contrary notwithstanding, an Employer required to make contributions on behalf of a "Supervisor" shall make contributions on the basis of 168 hours each month.

The parties recognize that individuals employed by corporations who are party to this Agreement may perform both bargaining unit and non-bargaining unit work. Certain of these employees receive compensation in such manner that it is difficult to determine for purposes of

fringe benefit contributions the precise number of hours which are spent performing bargaining unit work. It is therefore agreed that when an employee who is employed by a corporation, performs both bargaining unit work and non-bargaining unit work and who:

A. Is a shareholder, officer and/or director of the corporation or

B. Is a relative (father, mother, son, daughter, brother, sister, husband, wife, in-law) of a shareholder, officer and/or director of the corporation

The bargaining parties have agreed that any shareholder/relative reporting under this clause must report 150 hours per month twelve (12) months a year, irrespective of the amount of work they perform or the amount of compensation they receive in any individual month.

Corporate officers and their children will be exempt from this provision when they operate equipment doing bargaining unit work during an emergency such as fire, flood or to save life or property.

The exemptions provided herein do not relieve the Employer from the obligations of Article III, Section 2 Regular Assigned Engineers of this Agreement.

(C) FAMILY AND MEDICAL LEAVE ACT (FMLA): The Employer of any employee who is eligible for and requests leave under the Family and Medical Leave Act (FMLA) shall promptly notify the Health and Medical Leave Fund Office, and before the leave commences, if possible. Employers shall make Health and Welfare contributions for any employee who is taking leave under the FMLA on the basis of forty (40) hours per week.

SECTION 2 - PENSION FUND - Effective June 1, 2001, the Employer shall be liable to contribute FOUR DOLLARS AND NO CENTS ($4.00) per hour for which

the employee receives wages under the terms of this Agreement and shall pay FOUR DOLLARS AND NO CENTS ($4.00) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Fund, and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

Effective June 1, 2002, the Employer shall be liable to contribute FOUR DOLLARS AND TWENTY-FIVE CENTS ($4.25) per hour for which the employee receives wages under the terms of this Agreement and shall pay FOUR DOLLARS AND TWENTY-FIVE ($4.25) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Plan, and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

Effective June 1, 2003, the Employer shall be liable to contribute FOUR DOLLARS AND FIFTY CENTS ($4.50) per hour for which the employee receives wages under the terms of this Agreement and shall pay FOUR DOLLARS AND FIFTY CENTS ($4.50) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Plan, and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

June 1, 2004, the Employer shall be liable to contribute FOUR DOLLARS AND EIGHTY-FIVE CENTS ($4.85) per hour for which the employee receives wages under the terms of this Agreement and shall pay FOUR DOLLARS AND EIGHTY-FIVE CENTS ($4.85) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Plan, and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

Effective June 1, 2005, the Employer shall be liable to contribute FIVE DOLLARS AND FIFTEEN CENTS ($5.15) per hour for which the employee receives wages under the terms of this Agreement and shall pay FIVE DOLLARS AND FIFTEEN CENTS ($5.15) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Plan, and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

Effective June 1, 2006, the Employer shall be liable to contribute FIVE DOLLARS AND SIXTY CENTS ($5.60) per hour for which the employee receives wages under the terms of this Agreement and shall pay FIVE DOLLARS AND SIXTY CENTS ($5.60) per hour for each hour worked by a Supervisor covered by this Agreement to the Fund Office which will be paid to the Midwest Operating Engineers Excess Benefit Fund in the amount (if any) determined by the Trustees of the Excess Benefit Fund in accordance with the provisions of the Excess Benefit Plan,

and the remainder, if any, will be paid to the Midwest Operating Engineers Pension Fund.

For Apprentices see schedule in Article VIII, Section 2.

The Pension Fund has been established and shall be administered in accordance with the Labor Management Relations Act of 1947 as amended.

Payments accompanied by monthly reports on forms provided for the same are due in the Pension Office, 6150 Joliet Road, Countryside, Illinois 60525, or at such other place as designated by the Trustees, not later than the tenth (10th) day of the following month for the preceding month.

Contributions to the Pension Trust Fund shall not constitute or be deemed wages due to the employee.

It is understood and agreed that the Employer shall be bound by the terms and provisions of the Agreement and Declaration of Trust of the Midwest Operating Engineers Pension Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

If payment for contributions as defined above is not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement and shall be liable for contributions due, liquidated damages, interest, and any other cost of collection.

Anything herein contained to the contrary notwithstanding, an Employer required to make contributions on behalf of a "Supervisor" shall make contributions on the basis of 168 hours each month.

The parties recognize that individuals employed by corporations who are party to this Agreement may perform both bargaining unit and non-bargaining unit work.

62

Certain of these employees receive compensation in such a manner that it is difficult to determine for purposes of fringe benefit contributions the precise number of hours which are spent performing bargaining unit work. It is therefore agreed that when an employee who is employed by a corporation, performs both bargaining unit work and non-bargaining unit work and who:

A.  Is a shareholder, officer and/or director of the corporation or

B.  Is a relative (father, mother, son, daughter, brother, sister, husband, wife, in-law) of a shareholder, officer and/or director of the corporation

The bargaining parties have agreed that any shareholder/relative reporting under this clause must report 150 hours per month twelve (12) months a year, irrespective of the amount of work they perform or the amount of compensation they receive in any individual month.

Corporate officers and their children will be exempt from this provision when they operate equipment doing bargaining unit work during an emergency such as fire, flood or to save life or property.

The exemptions provided herein do not relieve the Employer from the obligations of Article III, Section 2 Regular Assigned Engineers of this Agreement.

Commencing October 1, 2000, the Employer agrees to make payments to the Midwest Operating Engineers Pension Fund, in the amount (if any) determined by the Trustees of the Excess Benefit Fund. Such contributions to the Excess Benefit Fund shall be an offset against the amounts otherwise due to be paid by the Employer to the Midwest Operating Engineers Pension Fund pursuant to the first paragraph of this Section, and the amount the Employer is obligated by this Agreement to contribute to the Midwest Operating Engineers Pension Fund shall be

63

reduced by the amounts contributed to the Excess Benefit Fund pursuant to the determination of the Trustees of the Excess Benefit Fund. The parties agree that the Midwest Operating Engineers Excess Benefit Fund (a) will be a non-qualified defined contribution plan, (b) shall only provide benefits for people who are, at the time of benefit payments, retired under the Midwest Operating Engineers Pension Fund and who had benefit payments, retired under the Midwest Operating Engineers Pension Fund and who had benefit payments reduced in prior years on account of Internal Revenue Code Section 415, and (c) that such Excess Plan benefits will be payable only when and to the extent determined by the Trustees of the Excess Benefit otherwise rendered moot by legislative action, and all benefit payments under the Midwest Operating Engineers Pension Fund that were previously reduced on account of Section 415 have been made up, through the Excess Benefit Fund or otherwise, this paragraph shall have neither force nor effect. In such event, the remaining articles of this collective bargaining agreement shall be unaffected, and shall otherwise remain in full force and effect.

SECTION 3 - VACATION FUND - Effective the 1st day of June, 2001, each Employer bound hereby shall pay ONE DOLLAR AND SIXTY CENTS ($1.60) per hour for each hour wages are received by an employee covered by this Agreement into the Local 150 I.U.O.E. Trusteed Vacation Savings Plan.

Effective the 1st day of June, 2002, each Employer bound hereby shall pay ONE DOLLAR AND SEVENTY CENTS ($1.70) per hour for each hour wages are received by an employee covered by this Agreement into the Local 150 I.U.O.E. Trusteed Vacation Savings Plan.

Effective the 1st day of June, 2003, each Employer bound hereby shall pay ONE DOLLAR AND EIGHTY

64

CENTS ($1.80) per hour for each hour wages are received by an employee covered by this Agreement into the Local 150 I.U.O.E. Trusteed Vacation Savings Plan.

Effective the 1st day of June, 2006, each Employer bound hereby shall pay ONE DOLLAR AND NINETY CENTS ($1.90) per hour for each hour wages are received by an employee covered by this Agreement into the Local 150 I.U.O.E. Trusteed Vacation Savings Plan.

For Apprentices see schedule in Article VII, Section 2.

In computing the above amounts, the Employer is required to add the amount per hour to the employee's gross wages and then deduct the Social Security and Withholding Tax from the gross figure on each check. The full amount shall then be set aside for remittance to the Vacation Savings Plan.

Each Employer bound hereby irrevocably appoints as his representative on the Board of Trustees such Trustees as are named in the Agreement and Declaration of Trust as Employer Trustees and their successors duly appointed as therein set forth, and agrees to be bound by all the terms and provisions of the Agreement and Declaration of Trust, Local 150 I.U.O.E. Vacation Savings Plan, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

Payments accompanied by monthly reports on forms provided for same are due in the Vacation Savings Plan Office, 6150 Joliet Road, Countryside, Illinois 60525, not later than the tenth (10th) day of the following month for the preceding month. Report forms are available at the above address. However, if payment is not in by the twentieth (20th) day of the month, it shall be considered a violation of this Agreement and the aforementioned Trust Agreement and shall be liable for contributions due, liquidated damages, interest, and any other cost of collection.

65

Additional information and Employer code numbers can be obtained in the Vacation Savings Office at 6150 Joliet Road, Countryside, Illinois 60525.

## ARTICLE X

APPRENTICESHIP AND SKILL IMPROVEMENT FUND - A Trusteed Apprenticeship and Skill Improvement Fund has been created and is known as the Operating Engineers Local 150 Apprenticeship Fund.

Effective June 1, 2001, the Employer shall pay FORTY-FIVE CENTS ($0.45) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

Effective June 1, 2002, the Employer shall pay FIFTY CENTS ($0.50) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

Effective June 1, 2003, the Employer shall pay FIFTY-FIVE CENTS ($0.55) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

Effective June 1, 2004, the Employer shall pay SIXTY CENTS ($0.60) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

Effective June 1, 2005, the Employer shall pay SIXTY-FIVE CENTS ($0.65) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

Effective June 1, 2006, the Employer shall pay SEVENTY CENTS ($0.70) for each hour the employee receives wages under the terms of this Agreement into the aforementioned Apprenticeship Fund.

66

It is understood and agreed that the Employer shall be bound by the terms and provisions of the Agreement and Declaration of Trust of the Apprenticeship Fund, and all amendments heretofore or hereafter made thereto, as though the same were fully incorporated herein.

The Employer further agrees to be bound by the terms of the Apprenticeship Standards established by the Joint Apprenticeship Training Committee of the Northern Illinois and Northern Indiana Apprenticeship and Skill Improvement Program, as approved by the United States Department of Labor, Bureau of Apprenticeship Training.

The Apprenticeship Fund has been established and shall be administered in accordance with the Labor Management Relations Act of 1947, as amended, and all other applicable Federal and State Laws.

Contributions of the Employer together with report forms supplied for such purpose are due in the Apprenticeship Fund Office not later than the tenth (10th) day of the following month.

Contributions to the aforesaid Apprenticeship Fund shall not constitute or be deemed wages due to the employee.

The sole liability of the Employer to the Apprenticeship Fund shall be the payment of hourly contributions as set forth in this Article, provided, however, that nothing herein shall be interpreted to release the Employer from its obligations under the Apprenticeship Standards as set forth above.

If payment for contributions as defined above is not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement and shall be liable for contributions due, liquidated damages, interest, and any other cost of collection.

67

# ARTICLE XI
## DUES CHECK OFF

Upon receipt of a written check of authorization form from an employee, the Employer agrees to deduct each week the applicable initiation fees and monthly dues uniformly required for obtaining and maintaining membership in the Union from the pay of each employee covered by this Agreement and shall remit the same to the Union, no later than the tenth (10th) day of each month, together with an itemized statement of such deductions. No deductions shall be made which are prohibited by applicable law. Payments, accompanied by monthly reports on forms provided shall be submitted to the Midwest Operating Engineers Fringe Benefit Fund, 6150 Joliet Road, Countryside, Illinois 60525. Report forms are available at the above address.

However, if payment is not received by the twentieth (20th) day of the month, it shall be considered a violation of this Agreement, and the Union shall be entitled for all contributions due, liquidated damages, interest, and any other cost of collections.

It is the intention of the parties that such deductions shall comply with the requirements of the Section 302 (c) (4) of the Labor Management Relations Act of 1947, as amended, and that such deductions shall be made only pursuant to written assignments from each employee on whose account such deductions are made, which assignment shall not be irrevocable for a period of more than one (1) year, or beyond the termination date of this Agreement, whichever occurs sooner.

The Union agrees to indemnify and hold harmless the Employer, from any claim, suit, cause of action, or otherwise as regards a creation of the Dues Deduction, its administration or any act or action in connection therewith

68

and such indemnify and agreement to hold harmless shall include the payment of costs and attorneys' fees in behalf of the beneficiaries of such indemnity.

# ARTICLE XII
## INDUSTRY ADVANCEMENT FUND AND CONSTRUCTION INDUSTRY RESEARCH AND SERVICE TRUST FUND

Effective June 1, 2001, the Employer shall pay EIGHTEEN CENTS ($0.18) per hour for each hour for which employees and supervisors receive wages under the terms of this Agreement into the Construction Industry Research and Service Trust Fund ("CRF").

Contributions of the Employer shall be forwarded to CRF in care of the Midwest Operating Engineers Fringe Benefit Funds, 6150 Joliet Road, Countryside, Illinois 60525 ("MOE"), together with report forms supplied for such purposes not later than the tenth (10th) day of the following month. It is understood and agreed that MOE will administer the collection and distribution of the CRF contributions and will receive a reasonable fee for that service, subject to approval of the Trustees of the CRF. The contributions to the aforesaid Construction Industry Research and Service Trust Fund shall not constitute or be deemed wages due to the employee.

Of the CRF contributions, SEVEN CENTS ($0.07) per hour for each hour for which contributions are made will be distributed to the MARBA Industry Advancement Fund (MARBA), a not-for-profit corporation, and Excavators, Inc., a not-for profit corporation, to be divided with sixty percent (60%) to MARBA and forty percent (40%) to Excavators, Inc.; and ONE CENT ($0.01) per hour for each hour for which contributions are made will be distributed to the Construction Industry Service Corporation ("CISCO"), a not-for-profit corporation. The remaining

69

TEN CENTS ($0.10) per hour for each hour for which contributions are made will be distributed by the CRF Trustees in accordance with the power and authority granted to them in the applicable CRF Agreement and Declaration of Trust.

Anything herein contained to the contrary notwithstanding, there is specifically excluded from the purposes of the CRF and/or any of the entities to which it distributes contributions, the right to use any of its funds for lobbying in support of anti-labor legislation and/or to subsidize contractors during a period of work stoppage or strikes. MARBA, Excavators, Inc. CISCO and all other recipients of CRF funds shall report annually to the CRF giving a complete review of their activities and the activities of any of their members, including, a certified audit showing the CRF disbursements. The CRF shall report annually to Local 150, IUOE, giving a complete review of its activities and a certified audit showing the Fund disbursements. Said review and audit to be furnished no later than May 1st of each year.

It is understood and agreed that the Employer shall be bound by the terms and provisions of the Agreement and Declaration of Trust of the Construction Industry Research and Service Trust Fund, and all amendments heretofore or hereafter thereto, as though the same were fully incorporated herein.

If payment for contributions as defined above is not received by the Fund Office by the twentieth (20th) day of the month, the Employer shall be deemed to be in violation of this Agreement and the aforementioned Trust Agreement and shall be liable for contributions due, liquidated damages, interest and any other costs of collection.

The administration of this Fund shall be solely in the hands of the CRF and no Employer shall pay or deliver any

funds to any representative of his employees. The Fund and the Trustees thereof, agree to indemnify and hold harmless the Union, its officers, agents, representatives and members from any claim, suit, cause of action, or otherwise as regards a creation of the Fund, its administration or any act or action in connection therewith, and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

The Association agrees to indemnify and hold harmless the Union, its Officers, Agents, Representatives and members from any claim, suit, cause of action, or otherwise as regards the collection and transmission of Industry Advancement Fund collections.

## ARTICLE XIII

## SAVINGS CLAUSE

Any provision contained herein that is contrary to or held to be in violation of the Labor Management Relations Act of 1947, or any Federal Law now in force or hereafter enacted, or hereafter becoming effective, shall be void, and of no force or effect, and this contract shall be construed as if said void provision here were not a part thereof, it being intended, however, that the other provisions of this contract shall not be affected thereby.

It is further agreed that should compliance with any Federal Law, or amendment thereof, or any order or regulation issued thereunder, now or hereafter in force and effect, prohibit the carrying out of any of the provisions of this Agreement, then to the extent of such deviation or prohibition this Agreement shall be deemed to have been automatically amended, effective on the effective date of such law, order or regulation.

Such amendment to this contract shall remain in effect only so long as said law, amendment, order or regulation continues in force, or until the expiration of this Agreement, whichever event shall first occur.

## ARTICLE XIV
## CONTRACT REOPENER

In the event that the provisions of the Davis-Bacon Act, 40 U.S.C. 276 (A) and/or the provisions of the State of Illinois Prevailing Wage Act, 820 ILCS 130 et seq, are repealed or substantially modified in a manner which adversely affects the ability of signatory Employers to compete for State or Federal work, the parties to this Agreement agree to immediately reopen the agreement and negotiate appropriate changes in terms and conditions of employment to maintain contractor competitiveness for such work. In the event no agreement is reached after sixty (60) days of the commencement of such negotiations, then either party may resort to self-help, including but not limited to strikes, lockouts, and unilateral implementation.

## ARTICLE XV
## ENTIRE AGREEMENT OF THE PARTIES

This represents the entire Agreement of the parties, it being understood that there is no other Agreement or understanding, either oral or written. The Employer understands that the Union is a fraternal society and as such, and in keeping with the provisions of the Labor Management Relations Act of 1947, as amended, has the right to prescribe its own rules and regulations with respect to the acquisition or retention of membership in the Union or with respect to any other matters for its own use. However, such rules or regulations whether contained in a by-laws, constitution or otherwise shall have no effect directly or indirectly upon this Collective Bargaining Agree-

72

ment, any employment relationship or the relationship between the parties.

EFFECTIVE DATE – This Agreement shall become effective the 1st day of June, 2001, except as otherwise provided herein, and remain in full force and effect until the 31st day of May, 2007; and shall thereafter continue from year to year, unless at least sixty (60) days prior to the expiration date, or as thereafter extended, either party herein shall notify the other in writing of its intention to terminate. It is contemplated that the parties will, in said sixty (60) days period meet with each other to negotiate a new agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement this 13th day of August, 2001.

REPRESENTING THE:
MID-AMERICA REGIONAL
BARGAINING
ASSOCIATION on behalf
of its members:

REPRESENTING THE:
INTERNATIONAL
UNION OF OPERATING
ENGINEERS,
LOCAL 150, AFL-CIO

MARBA
2720 River Road
Room 222
Des Plaines, Illinois 60018
847-699-1283

73

## Illustrations and Definition of Piggybacking and Staging of Electric Submersible Pumps as applied in the Heavy and Highway and Building Agreements

Electric Submersible pumps may be physically connected to each other (piggyback) without causing any increase in discharge as calculated under this section.

Discharge of Electric Submersible pumps which are not piggy-backed but which are physically connected by hose, pipe, etc. or are otherwise staged shall be calculated separately and totaled in calculating total discharge under this section. (See illustration)

**3 in. Discharge**

Count only one discharge = 3 in.

Pumps connected together — 3 in. pump | 3 in. pump

PIGGYBACK

**6 in. Discharge**

Count both discharges

2-3 in. pumps equal 6 in. discharge — 3 in. pump | 3 in. pump

STAGING

REPRESENTING THE:
MID-AMERICA REGIONAL
BARGAINING ASSOCIATION

REPRESENTING THE:
I.U.O.E.
LOCAL UNION 150

74

---

## MEMORANDUM OF CLARIFICATION regarding Application of Illinois Building/Heavy and Highway and Underground Agreements of Local 150 I.U.O.E. which expire on June 30, 1981 in their application to:

### SEWAGE PLANTS

This memorandum based on a site visit to the Aurora Sewage Plant, Montgomery, Illinois (See minutes Case No. 79-1 and Joint Grievance Committee Minutes, January 4, 1980) (A. J. Lowe Co. vs. Local 150 I.U.O.E.), is effective July 15, 1980.

1. All sewer and watermain pipe outside of structure wall or building wall to be installed under the Heavy and Highway and Underground Agreement.

2. All sewer and watermain pipe inside a structure wall or building wall to be installed under the Illinois Building Agreement.

3. All air feed pipe and chemical feed pipe, even though installed underground, shall be installed under the Illinois Building Agreement.

MID-AMERICA REGIONAL
BARGAINING ASSOCIATION

LOCAL 150
INTERNATIONAL UNION
OF OPERATING
ENGINEERS

75

The Union and the Association together shall create a Competition Committee.

This Committee shall consist of an equal number of members representing the Employer and Union with no less than three (3) persons from each group. The Union and/or Association may appoint alternate members.

The purpose of this Committee shall be to consider and implement under appropriate circumstance and based on adequate economic justification modification of this Agreement to apply to specific projects and/or geographic areas to assure continue work opportunities for employees working under this Agreement.

FOR THE ASSOCIATION       FOR THE UNION

76

---

## WORK CONTINUATION PROGRAM

In an effort to maintain a positive labor relations environment and a competitive union construction market in the Metropolitan Chicago Area, the contractor members represented by Mid-America Regional Bargaining Association (MARBA), their collective bargaining representative, and International Union of Operating Engineers Local 150 now agree as follows:

1. The parties agree to exchange contract proposals at least 90 days prior to the expiration date of the contract.

2. The parties agree to meet on a regular basis (to be determined) at least 30 days before expiration.

3. After the expiration date, and for 30 days following, the parties will meet Mondays, Wednesdays and Fridays for a designated period of time (to be determined) until an agreement is reached.

4. Any time after the expiration date an agreement is reached, it shall be retroactive back to the day after expiration.

5. If after 30 days from expiration no agreement is reached, the Union retains the right to strike.

FOR THE ASSOCIATION       FOR THE UNION

77

# JOINT LABOR-MANAGEMENT
## UNIFORM DRUG/ALCOHOL ABUSE PROGRAM

## I. POLICY STATEMENT

The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. COMPANY NAME, and the signatory union seeks to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, healthy work environment for all of its employees.

## II. DEFINITIONS

A. Company Premises - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

B. Prohibited Items & Substances - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcoholic beverages, and drug paraphernalia in the possession of or being used by an employee on the job.

C. Employee - Individuals, who perform work for (COMPANY NAME), including, but not limited to, management, supervision, engineering craft workers and clerical personnel.

D. Accident - Any event resulting in injury to a person or property to which an employee, or contractor/contractor's employee, contributed as a direct or indirect cause.

E. Incident - An event which has all the attributes of an accident, except that no harm was caused to person or property.

78

F. Reasonable Cause - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

## III. CONFIDENTIALITY

A. All parties to this policy and program have only the interests of employees in mind, therefore, encourage any employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The Company will also take action to assure that your illness is handled in a confidential manner.

B. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

C. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

D. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

E. The handling and transportation of each specimen will be properly documented through the strict chain of custody procedures.

## IV. RULES - DISCIPLINARY ACTIONS - GRIEVANCE PROCEDURES

1. Rules - All employees must report to work in a physical condition that will enable them to perform their jobs in a safe and efficient manner. Employees shall not:

79

a. Use, possess, dispense or receive prohibited substances on or at the job site; or

b. report to work with any measurable amount of prohibited substances in their systems.

2. **Discipline** - When the company has reasonable cause to believe an employee is under the influence of a prohibited substance, for reasons of safety, the employee may be suspended until test results are available. If no test results are received after three (3) working days, the employee, if available, shall be returned to work with back pay. If the test results prove negative, the employee shall be reinstated with back pay. In all other cases:

A. Applicants testing positive for drug use will not be hired.

B. Employees who have not voluntarily come forward, and who test positive for a drug use, will be terminated.

C. Employees who refuse to cooperate with testing procedures will be terminated.

D. Employees found in possession of drugs or drug paraphernalia will be terminated.

E. Employees found selling or distributing drugs will be terminated.

F. Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3. **Prescription Drugs** - Employees using a prescribed medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisor of such prescription drug use. For the safety of all employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to

80

accommodate your needs by making an appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by the prescribing physician.

4. **Grievance** - All aspects of this policy and program shall be subject to the grievance procedure of the applicable collective bargaining agreement.

**V. DRUG/ALCOHOL TESTING** - The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing. While "random" testing is not necessary for the proper operation of this policy and program, it may be necessary to require testing under the following conditions:

A. A pre-employment drug and alcohol test may be administered to all applicants for employment;

B. A test may be administered in the event a supervisor has a reasonable cause to believe that the employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the employee has the right to request his on-site representative to be present;

C. Testing may be required if an employee is involved in a workplace accident/incident or if there is a workplace injury;

D. Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period;

E. Employees may also be required to be tested on a voluntary basis. Each employee will be required to sign a consent and chain of custody form, assuring proper documentation and

81

accuracy. If an employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood tests will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

## VI. REHABILITATION AND EMPLOYEE ASSISTANCE PROGRAM

Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable employee assistance program for treatment, and will counsel the employee regarding medical benefits available under the company or union health and welfare/insurance program.

If treatment necessitates time away from work, the company shall provide for the employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

82

NOTES

NOTES



**EXHIBIT C**

# INTERNATIONAL UNION OF OPERATING ENGINEERS

LOCAL UNION NO. 150, 150B, 150A, 150C, 150RA, 150D, 150G, 150M

AFFILIATED WITH THE A.F.L.-C.I.O. AND BUILDING TRADES DEPARTMENT

**WILLIAM E. DUGAN**
PRESIDENT-BUSINESS MANAGER

(708) 482-8800 · FAX (708) 482-7186
6200 JOLIET ROAD
COUNTRYSIDE, IL 60525-3992

October 11, 2006

***Via Fax (847) 854-2928 and***
***CM 7005 1820 0001 6674 7242***

Mr. Ed MacDonald, President
MacDonald Construction Services, Inc.
308 Oakleaf Road
Lake in the Hills, IL 60156

RE:     Violation of the MARBA Illinois Building Agreement
        Article V, Section 6 -  Severance Pay *(Bryan J. Branbury);* and
        Article V, Section 1 – Starting Time, Work Day, Lunch Period.
        Union File No. 06-261

Dear Mr. MacDonald:

We are advised that your company is in violation of various articles and sections, including but not limited to that captioned above, of the MARBA Illinois Building Agreement (Districts 1-2-3), to which your Company and this Union are parties by virtue of a Memorandum of Agreement signed July 10, 2006.

We are further advised that the above-stated violation occurred on or about August 27, 2006, on your construction site located on Weber Road and Caton Farm Road, in Crest Hill (Menards), Illinois, within Local 150's jurisdictional territory, where your company failed to pay severance pay and violated the terms set forth in Article V, Section 1, of the Agreement.  See attached Agent's Statement for further details, including damages owed in the current aggregate amount of **$1,761.19**.

In compliance with Step One of the Grievances and Arbitration clause of our Agreement, Article II, Section 1, our Business Representative, Tom Ferrallo, attempted to contact you via telephone and left a message and has not yet received a response from you, but the grievance remains unresolved.  Therefore, in a further attempt to resolve this dispute, I have designated James McNally, Assistant to the President, to meet with your designated company officials at the Local Union office, 6200 Joliet Road, Countryside, Illinois 60525, on **Tuesday, November 14, 2006, at 1:15 p.m.** If the Company Officer cannot attend, please send a representative.

Alternatively, you may <u>mail your settlement checks to the attention of Steven M. Cisco</u> at the above address prior to the date of hearing in the full amounts as follows:

1.     **$1,075.90 payable to Bryan J. Banbury (less appropriate deductions); and**
2.     **$  685.29 payable to Midwest Operating Engineers Fund.**



NATIONAL UNION OF OPERATING ENGINEERS

MacDonald Construction Services, Inc.
Mr. Ed MacDonald, President
October 11, 2006
File No. 06-261
Page 2


It is in the best interest of your company to negotiate a settlement at the pre-grievance hearing. Many grievances are resolved at this meeting. If you do not attend the pre-grievance hearing or mail us your settlement checks prior to that date and this matter remains unresolved, it will be automatically scheduled for the next meeting of the Joint Grievance Committee.

This Union shall continue to hold your Company liable for all appropriate remedies, including but not limited to any back wages and fringe benefits lost by this and all affected members of the bargaining unit who would be working had you honored our Agreement.

Sincerely,
William E. Dugan
PRESIDENT-BUSINESS MANAGER

By:    Steven M. Cisco
       Recording-Corresponding Secretary

SMC/hca
Attachment

cc:    James McNally, Assistant to the President
       Tom Ferrallo, Business Representative – Dist. 2
       Dale D. Pierson, General Counsel
       Ron Selby, Jr., MOE Delinquency
       Mid-America Regional Bargaining Association
       Bryan J. Banbury, Member/Grievant

**EXHIBIT D**

## JOINT GRIEVANCE COMMITTEE
### OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMAN**
John Vignocchi/Joseph Benson
Mid-America Regional
  Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois  60018
Telephone: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President-Business Manager
Local 150, International Union
  of Operating Engineers
6200 Joliet Road
Countryside, Illinois  60525
Telephone: (708) 482-8800

<u>**VIA CERTIFIED & REGULAR MAIL**</u>

December 27, 2006

Mr. Ed MacDonald
MacDonald Construction Services, Inc.
308 Oakleaf Road
Lake in the Hills, IL  60156

Mr. Tom Ferrallo
Operating Engineers Local 150
1050 E. Frontage Road
Joliet, IL  60431

SUBJECT:    **Grievance Hearing No. 07-2**
            **Union File No. 06-261**

Gentlemen:

A hearing of the above grievance will be held at the offices of the **Mid-America Regional Bargaining Association, 2720 River Road, Suite 222, Des Plaines, Illinois**, at the time and date indicated below:

DATE:  **Wednesday, January 10, 2007**

TIME:   **10:00 A. M.**

Please note that the Committee may, by majority vote, reach a binding decision and may act in the absence of either party.  The proceedings assure an opportunity to present matters in your behalf, including any documented evidence, records, witnesses, etc., and to rebut testimony of the Grievant or his Representative.

Please address questions to the undersigned at the Des Plaines Avenue address and telephone shown.  The telephone number of the MARBA office is (847) 699-1283 should you wish to contact the Joint Committee during hearing hours.

Sincerely,

*Carol A. Lord*

Carol A. Lord
Committee Secretary

cc:    Co-Chairmen
       Heidi Adams

**CERTIFIED MAIL** #7006 0100 0005 7504 7563

**EXHIBIT E**

## JOINT GRIEVANCE COMMITTEE
## OPERATING ENGINEERS, LOCAL 150

**CO-CHAIRMEN**
John Vignocchi/Joseph Benson
Mid-America Regional
  Bargaining Association
2720 River Road
Suite 222
Des Plaines, Illinois  60018
TELEPHONE: (847) 699-1283

**CO-CHAIRMAN**
William E. Dugan
President & Business Manager
Local 150, International Union
  of Operating Engineers
6200 Joliet Road
Countryside, Illinois  60525
TELEPHONE: (708) 482-8800

January 11, 2007

Mr. Ed MacDonald
MacDonald Construction Services, Inc.
308 Oakleaf Road
Lake in the Hills, IL  60156

Mr. Tom Ferrallo
Operating Engineers Local 150
1050 E. Frontage Road
Joliet, IL  60431

**SUBJECT:    Grievance No. 07-2**
**            Union File No. 06-261**

This is to confirm the decision of the Joint Committee in the above case as announced following a
hearing on January 10, 2007, at the office of the Mid-America Regional Bargaining Association,
2720 River Road, Suite 222, Des Plaines, Illinois.

Based on the testimony heard, the Committee, by majority decision, has determined as follows:

1) The Employer shall pay to Bryan J. Banbury
   the sum of $1,075.90 in payment of wages.
2) The Employer shall pay to the Midwest Operating Engineers
   Fund the sum of $685.29 in payment of fringe benefits
   for Bryan J. Banbury.
3) The checks should be sent to Steven Cisco, Local 150
   for distribution.

Your attention is directed to Article II, Section 1 of the Building Agreement which provides in part that:
"Decisions of the Joint Grievance Committee and Arbitration Awards shall be complied with within seven
(7) days of receipt of the decision by the losing party.  A party which fails to comply within the seven (7)
day period shall be required to pay an additional ten percent (10%) of all amounts owed as liquidated
damages for failure to comply with the decision or award.  In the event the prevailing party is required to file
suit to enforce the decision or award, and it prevails, it shall be entitled to recover its costs, including
attorney's fees, from the losing party."

Sincerely,


Carol A. Lord
Committee Secretary

cc:   Co-Chairmen
      Heidi Adams